**KERR–McGEE CORPORATION, a Delaware corporation, Plaintiff-Appellee,**

v.

**NAVAJO TRIBE OF INDIANS, Defendant-Appellant.**

**KERR–McGEE CORPORATION, a Delaware corporation, Plaintiff-Appellant,**

v.

**NAVAJO TRIBE OF INDIANS, a tribe of American Indians recognized by the United States Department of the Interior, et al., Defendants-Appellees.**

Nos. 82–5725, 82–5736.

United States Court of Appeals, Ninth Circuit.

Argued April 15, 1983.

Submitted Aug. 22, 1983.

Decided April 17, 1984.

Alvin H. Shrago, Fred E. Ferguson, Jr., Evans, Kitchel, Jenckes, P.C., Phoenix, Ariz., for Kerr-McGee.

Carol E. Dinkins, Asst. Atty. Gen., Dirk D. Snel, Kay L. Richman, Attys., Dept. of Justice, David Etheridge, Atty., Dept. of Interior, Washington, D.C., for amicus U.S.

George P. Vlassis, Katherine Ott, Vlassis & Ott, Phoenix, Ariz., for Navajo Tribe of Indians.

Before MERRILL, SKOPIL and FERGUSON, Circuit Judges.

MERRILL, Circuit Judge.

Kerr-McGee Corporation is a Delaware corporation engaged in business in New Mexico and Arizona. The Navajo Tribe of Indians is a tribe of American Indians situated upon a reservation created in part by treaty and in part by executive order in the states of Arizona, New Mexico, and Utah. The Tribe has no written constitution, but its self-governing powers are vested in the Navajo Tribal Council.

Kerr-McGee is a non-Indian mineral lessee of the Tribe. Since 1964, it has, under leases approved by the Secretary of the Interior, engaged in mining uranium and extracting oil and gas from portions of the Navajo reservation in New Mexico and Arizona. In 1978, the Tribal Council adopted two new taxes directly affecting the Kerr-McGee operations: a tax presently set at 3% on the value of mining leasehold interests on reservation lands of a value in excess of $100,000 (the Possessory Interest Tax) and a tax presently set at 5% on the gross receipts of certain business activities conducted on the reservation, including every sale within or without the reservation

of a "Navajo good or service" (the Business Activities Tax).

By this action Kerr-McGee seeks to invalidate the taxes. In its complaint it charges that for many reasons the Tribal Council was without power to impose such taxes on non-Indians. The District Court rejected most of Kerr-McGee's contentions and granted summary judgment in favor of the Tribe on the counts of the complaint on which those contentions were based. Kerr-McGee has appealed from that judgment. The Court did, however, hold that the taxes were nevertheless invalid because the Tribe had not secured the approval of the tax by the Secretary of the Interior, an action which the Court held to be a requirement. It granted summary judgment in favor of Kerr-McGee on the count asserting that ground for invalidity. The Tribe has appealed from that judgment.

In its judgments the District Court in all respects followed the holding of the District Court for the District of Utah in the case of *Southland Royalty Co. v. Navajo Tribe of Indians*, No. 79–0140 (D.Utah, March 8, 1979). That case involved the precise questions presented here: the validity of the Tribal taxes on oil and gas leases and on gross receipts. The decision in that case was appealed to the Court of Appeals for the Tenth Circuit and that Court has now affirmed the Utah District Court on those portions of the judgment favoring the Navajo Tribe but has reversed the Utah District Court in its holding that approval of the tax by the Secretary of the Interior was required. *Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486 (10th Cir.1983).

KERR–McGEE APPEAL

*I. Inherent Power to Tax Lessees —*

In Count I of its amended complaint Kerr-McGee asserts that, as to it, the Tribe

is without the inherent power to tax; that by virtue of its leasehold Kerr-McGee has a right to presence within the reservation and cannot be excluded by the Tribe and that the Tribe, having no power to exclude, has no power to tax.

The Supreme Court in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), has held otherwise. It has made it clear that Indian tribes do have the inherent power to tax mining activities carried on within the reservation under lease from the tribes; that the power to tax is an essential attribute of Indian sovereignty and a necessary instrument of self-government. "[The power to tax] derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction." 455 U.S. at 137, 102 S.Ct. at 901. The Court makes it clear that Kerr-McGee's status as lessee does not deprive the Tribe of power to tax it; that such power is inherent in sovereignty and does not stem exclusively from the power to exclude one from tribal lands. Moreover, as the Court acknowledged in *Merrion*, the Tribe's interest in levying taxes for essential governmental programs on nonmembers " 'is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.' " 455 U.S. at 138, 102 S.Ct. at 902, *quoting Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156–57, 100 S.Ct. 2069, 2082–83, 65 L.Ed.2d 10 (1980). If the Tribe's interest was found sufficiently strong in the case of the oil and gas severance taxes in *Merrion*, they can be no less strong here.[1]

---

**1.** The Court points out that in *Washington v. Confederated Tribes of Colville Indian Reservation, supra,* it "noted that official executive pronouncements have repeatedly recognized that 'Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands * * * including the

jurisdiction to tax.' " 447 U.S. at 139, 100 S.Ct. at 902. The Court notes that both the executive and legislative branches have "acknowledged that the tribal power to tax is one of the tools necessary to self-government and territorial control." *Id.*

Since *Merrion* there can be no question that the Navajo Tribe has the inherent power to tax the mineral leases and operation of Kerr-McGee.

*II. Treaties of 1850 and 1868 —*

■ In Count II of its amended complaint Kerr-McGee alleges that both the Treaty of 1850, 9 Stat. 974, and the Treaty of 1868, 15 Stat. 667, bar the Navajo Tribe from taxing non-Indians.

With respect to the Treaty of 1850, Kerr-McGee asserts that Article III surrenders all civil jurisdiction to the United States. That provision states in relevant part:

The government of the said States having the sole and exclusive right of regulating the trade and intercourse with the said Navajos...

9 Stat. at 974. Yet this language does no more than recite that it is the federal government, and not the states, that possesses regulatory power over commerce and trade with the Tribe. That federal exclusivity of power as to the states does not undermine the ability of the Tribes to legislate in areas of retained sovereignty, unless Congress legislates to the contrary. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). In that context, there is nothing in the quoted Treaty language which would inhibit the Navajo's taxation of non-Indians. *See United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Babbitt Ford v. Navajo Indian Tribe,* 710 F.2d 587 (9th Cir.1983).

■ With respect to the Treaty of 1868, Kerr-McGee asserts that Article IX expressly prohibits Tribe interference with its oil and gas operations. That provision states:

[The Tribe] will not in future oppose the construction of railroads, wagonroads, mail stations, or other works of utility or necessity which may be ordered or permitted by the laws of the United States.

15 Stat. at 670. Kerr-McGee argues that its oil and gas operations are works of utility and that by taxing its operations, the Tribe "opposes" them. We find this argument wholly without merit. Placed in context, it becomes clear that this portion of the Treaty was concerned with a cessation of armed hostility on the part of the Tribe, and not with its power to tax.[2]

*III. The Mineral Leasing Act of 1938 —*

■ In Count III of its amended complaint, Kerr-McGee asserts that the Mineral Leasing Act of 1938 has preempted all power of the Navajo Tribe to tax non-Indians. The Act, 25 U.S.C. § 396 *et seq.,* provides in part at § 396d: "All operations under any oil, gas, or other mineral lease issued pursuant to the terms [of any act affecting restricted Indian lands] shall be subject to the rules and regulations promulgated by the Secretary of the Interior." The regulatory procedure set up pursuant to the Act is set forth at 25 C.F.R. Part 171 (now Part 211 (1982)). Kerr-McGee argues that the regulatory scheme is so pervasive that it preempts all power on the part of the Tribe to deal with mineral leases, including the power to tax. It notes that the regulations allow for a lone exception: 25 C.F.R. § 171.29 provides that the provisions of the

---

**2.** In the Treaty of 1868, the Tribe agrees to cease hostilities:

3rd. That they will not attack any persons at home or travelling, nor molest or disturb any wagon trains, coaches, mules or cattle belonging to the people of the United States, or to persons friendly therewith.

4th. That they will never capture or carry off from the settlements women or children.

5th. They will never kill or scalp white men, nor attempt to do them harm.

6th. They will not in future oppose the construction of railroads, wagon roads, mail

stations, or other works of utility or necessity which may be ordered or permitted by the laws of the United States; ...

We note additionally that Kerr-McGee cites no authority, and we are aware of none, that equates oil and gas operations with a "work of utility" for the purposes of the Treaty. Kerr-McGee's reliance on *United States v. Andrews,* 179 U.S. 96, 21 S.Ct. 46, 45 L.Ed. 105 (1900), which finds the Chisholm Trail to be a work of utility such that cattle-rustling was violative of the Treaty, is inapposite.

regulations "may be superseded by the provisions of any tribal constitution, bylaw, or charter issued pursuant to the Indian Reorganization Act." The Navajo Tribe has elected not to organize under the Indian Reorganization Act ("IRA") and has not adopted a constitution. Kerr-McGee argues that the provisions of the regulation thus operate to preempt any power to tax the Kerr-McGee mineral leaseholds.

■ We reject this argument for several reasons. First, Kerr-McGee misinterprets the purpose of the 1938 Act. Its purpose was not to generate distinctions between tribes organized under the IRA and tribes not so organized, but rather was to "bring all mineral leasing matters in harmony with the Indian Reorganization Act." S.Rep. No. 985, 75th Cong., 1st Sess., at 3 (1937); H.R.Rep. No. 1872, 75th Cong., 3d Sess., at 3 (1938). At the time the 1938 Act was proposed, there was no statutory authority to lease lands on Indian Reservations created by executive order for mineral development (except oil and gas) in many states, unless a tribe had organized pursuant to Section 17 of the IRA, 25 U.S.C. § 477. *See* S.Rep. No. 985, *supra*, at 1–2. Tribes organized under Section 17 were empowered to lease their lands for periods of not more than ten years. *Id.* The purpose of the 1938 Act was to abolish these distinctions by enabling all tribes to lease for mineral development. *See* S.Rep. No. 985, *supra*, at 2; H.R.Rep. No. 1872, *supra*, at 1.

■ Second, we note that there is nothing in the Mineral Leasing Act which inhibits the Tribe's inherent ability to tax as an essential attribute of sovereignty. In fact, nothing in the Act or its corresponding regulations mentions tribal taxation.[3] Bearing in mind the Supreme Court's admonition to "tread lightly in the absence of clear indications of legislative intent [with respect to federal divestiture of Indian taxing power]," 455 U.S. at 149, 102 S.Ct. at 908, *quoting Santa Clara Pueblo v. Mar-*

*tinez,* 436 U.S. 49, 60, 98 S.Ct. 1670, 1678, 56 L.Ed.2d 106 (1978), we conclude that the power to tax was not preempted by the Mineral Leasing Act.

### IV. Breach of Contract —

■ In Count IV of its amended complaint Kerr-McGee asserts that imposition of the taxes on it constitutes a unilateral modification of its lease and a breach of an implied contract that the royalties there specified were to constitute the only monetary compensation. The Supreme Court, in *Merrion, supra,* has disposed of this contention. The Court there held that the payment of royalties under a lease does not exempt the lessee from payment of taxes. "The royalty payments from the mineral leases are paid to the Tribe in its role as partner in petitioners' commercial venture. The severance tax, in contrast, is petitioners' contribution 'to the general cost of providing governmental services.'" 455 U.S. at 138, 102 S.Ct. at 902, *quoting Commonwealth Edison v. Montana,* 453 U.S. 609, 623, 101 S.Ct. 2946, 2956, 69 L.Ed.2d 884 (1981). We are unable to find, therefore, any breach of contract on behalf of the Tribe.

### V. Commerce Clause —

■ In Counts V, VI, VII and VIII, Kerr-McGee asserts that imposition of the taxes violates the Commerce Clause of the United States Constitution because the Business Activities Tax impairs the privilege of engaging in interstate commerce and imposes multiple taxation without apportionment and because both taxes discriminate against interstate commerce.

The Commerce Clause, Article I, § 8, Clause 3, of the United States Constitution, empowers Congress "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." The extent to which the negative implications of the Interstate Commerce Clause, in striking down state laws for creating bur-

---

**3.** On the contrary, the legislative history suggests that an important purpose of the Mineral Leasing Act was to secure for the Indians "the

greatest return from their property." S.Rep. No. 985, 75th Cong., 1st Sess. at 2; H.R.Rep. No. 1872, 75th Cong., 3d Sess. at 2.

dens on interstate commerce, should be applied to tribal laws under the Indian Commerce Clause, has never been authoritatively determined. In *Merrion, supra,* the Supreme Court acknowledged that the Commerce Clause has been used by the Court "as a shield to protect Indian tribes from state and local interference". 455 U.S. at 153–54, 102 S.Ct. at 910. It declined to decide whether the clause could be used to strike down the tax before the Court, holding that the tax did, in any event, pass the tests established for judging burdens imposed on commerce between the states. *Id.* 154, 156–158, 102 S.Ct. 910, 911–12. We adopt the same course.[4]

*Complete Auto Transit v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977), held that a tax survives an Interstate Commerce Clause challenge if it is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State."

The first two requirements are met here since the mining activities taxed occur entirely on reservation land. *Merrion, supra,* 455 U.S. at 157, 102 S.Ct. at 912. The Possessory Interest Tax applies only to leases on lands under tribal jurisdiction. The Business Activities Tax is apportioned to fall only on activity occurring on lands under tribal jurisdiction. The value taxed is the value of the goods within the reservation or at the time the goods are transported outside of the reservation. The law thus escapes any multiple taxation problem by limiting its application to on-reservation value.

Under the third requirement, the question is whether the taxes discriminate in favor of local commerce by providing an advantage not enjoyed by interstate commerce. Kerr-McGee asserts that this is the case. It points to certain exemptions in the Business Activities Tax enjoyed by "traditional activities of Indians" and points out that few, if any, Indians would own leaseholds of a value making them subject to the Possessory Interest Tax. The Commerce Clause, however, looks not to ethnicity—Indian against non-Indian—but to competitive advantage in favor of local commerce. No such advantage is provided here.

 As with the tax considered in *Merrion,* the Navajo taxes do "not treat minerals transported away from the reservation differently than [they treat] minerals that might be sold on the reservation." 455 U.S. at 157–58, 102 S.Ct. at 912. There is, of course, nothing in the Commerce Clause which requires that all activities bear an equivalent tax burden. It is sufficient that there be no competitive disadvantage imposed for oil and gas sold on the reservation compared with oil and gas sold off the reservation.[5]

As to the fourth prong, Kerr-McGee asserts that the Business Activities Tax is not related in any way to any benefits provided to it by the Tribe; that there is no relationship between the tax imposed and the benefits received. At least, it argues, it should

---

**4.** The Court in *Merrion* did take note of the fact that the Jicarilla Tribe had adopted a constitution pursuant to the Indian Reorganization Act, 25 U.S.C. §§ 476, 477, and had secured the approval of the Secretary of the Interior to the constitution and to the tax. 455 U.S. at 155, 102 S.Ct. at 910–11. This was cited to establish the fact that Congress had provided steps by which approval of a tax could be secured and that such affirmative Congressional action eliminated the need for judicial scrutiny of the tax under the Commerce Clause. The Court further held, however, "The tax challenged here would survive judicial scrutiny under the Interstate Commerce Clause even if such scrutiny were necessary." *Id.* at 156, 102 S.Ct. at 911. It is the

Court's rationale at this point that we follow here.

**5.** Kerr-McGee also alleges that the Possessory Interest Tax discriminates because it excludes the activities and possessory interests of the Tribe. It is true that the Navajo taxes do exempt tribal governmental subdivisions. Yet *Merrion* upheld an analogous exemption in the Jicarilla tax, finding that such an exemption merely avoided "administrative make-work" and was not "a discriminatory preference for local commerce." 455 U.S. at 158, 102 S.Ct. at 912. We are similarly persuaded.

have a right to establish a factual record as to the extent of benefits received and the relationship that that figure bears to the tax imposed.

In *Commonwealth Edison Co. v. Montana, supra,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), the Supreme Court dealt with the questions presented by the fourth prong. It stated:

The relevant inquiry * * * is not * * * the *amount* of the tax or the *value* of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities. Rather, the test is closely connected to the first prong * * *. Under this threshold test, the interstate business must have a substantial nexus with the State before *any* tax may be levied on it. * * Beyond that threshold requirement, the fourth prong * * * imposes the additional limitation that the *measure* of the tax must be reasonably related to the extent of the contact * * *.

453 U.S. at 625-26, 101 S.Ct. at 2957-58.

In *Commonwealth Edison,* the tax was a severance tax measured by a percentage of the value of coal taken. This was held to be "in proper proportion" to the activities within the state. "When a tax is assessed in proportion to a taxpayer's activities or presence in a State, the taxpayer is shouldering its fair share of supporting the State's provision of 'police and fire protection, the benefit of a trained work force, and "the advantages of a civilized society." ' " *Id.* at 627, 101 S.Ct. at 2958. Accordingly, we find that the Business Activities Tax is sufficiently related to benefits provided to Kerr-McGee by the Tribe so as to survive a Commerce Clause challenge.

In that case Commonwealth Edison contended, as does Kerr-McGee, that factual inquiry should be had into the relationship between revenues generated by a tax and costs incurred on account of the taxed activity in order to assure that taxes are not excessive. The Court rejected this contention, stating: "The simple fact is that the appropriate level or rate of taxation is essentially a matter for legislative, and not

judicial, resolution." *Id.* at 627, 101 S.Ct. at 2958-59. It stated further: "In essence, appellants ask this Court to prescribe a test for the validity of state taxes that would require state and federal courts, as a matter of federal constitutional law, to calculate acceptable rates or levels of taxation of activities that are conceded to be legitimate subjects of taxation. This we decline to do." *Id.* at 628, 101 S.Ct. at 2959.

We conclude that all requirements of *Complete Auto Transit* have been met; that summary judgment in favor of the Tribe on all challenged counts should be affirmed.

NAVAJO TRIBE APPEAL

The District Court held both the Possessory Interest Tax and the Business Activities Tax invalid for the reason that approval of those taxes by the Secretary of the Interior had not been obtained. The Court took note of the fact that a tribe that had organized under the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.,* or the Navajo-Hopi Rehabilitation Act, 25 U.S.C. § 631 *et seq.,* would have to secure the Secretary's approval of its taxes. It noted that the Navajo Tribe had chosen not to organize under the IRA and had never adopted a constitution. It reasoned that the IRA manifested a Congressional policy in favor of organization of the tribes under constitutions approved by the Secretary; that a Congressional requirement of the Secretary's approval by an unorganized tribe such as the Navajo could be inferred because otherwise unorganized tribes could exercise greater power than those tribes that had acted in accordance with Congressional policy. It concluded: "[T]his court concludes that since Secretary approval is required for tax resolutions adopted pursuant to a tribal constitution surely Secretary approval must also be required for tax resolutions passed without a tribal constitution."

In this respect the District Court followed the holding of the District Court for the District of Utah in *Southland Royalty Co. v. Navajo Tribe of Indians, supra.* As we have noted, the Tenth Circuit has re-

versed the Utah Court in that respect. It held:

> We do not agree that there is support for this requirement [of Secretarial approval] in the statutes. The purpose of the IRA was to enable and encourage Indian self-government. Organization under the IRA was not the only form of self-government acceptable to Congress. One of the ways in which the IRA reflects a respect for self-government was in the provision that makes adoption of a constitution optional. 25 U.S.C. § 476. The choice of government is in itself an act of self-government and consonant with Congressional policies. The self-sufficiency of the Navajo Tribe could be impaired by the imposition of a requirement of secretarial approval of its actions as to taxes.

*Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486, 489 (10th Cir.1983).

■ We agree with the reasoning of the Tenth Circuit. We note that there is nothing in the Indian Reorganization Act or Navajo-Hopi Rehabilitation Act that requires tribes to submit their ordinances or resolutions to the Secretary for approval. It is true that tribal constitutions and charters of incorporation adopted pursuant to the IRA must be approved by the Secretary; yet, even as to organized tribes, the IRA itself does not require that any specific legislation be submitted for secretarial approval. Secretarial approval is required only of those tribes that have chosen to include such a requirement in their constitutions, bylaws or charters.

On the appeal taken by Kerr-McGee, JUDGMENT AFFIRMED.

On the appeal taken by the Navajo Tribe, JUDGMENT REVERSED.