**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY; HOMELAND INSURANCE COMPANY OF NEW YORK; HALLMARK SPECIALTY INSURANCE COMPANY; ASPEN SPECIALTY INSURANCE COMPANY; ASPEN INSURANCE UK LTD; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON MARKET COMPANIES SUBSCRIBING TO POLICY NO. PJ193647; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. PJ1900131; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON MARKET COMPANIES SUBSCRIBING TO POLICY NO. PJ1933021; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NOS. PD-10364-05 AND PD-11091-00; ENDURANCE WORLDWIDE INSURANCE LIMITED T/AS SOMPO INTERNATIONAL SUBSCRIBING TO POLICY NO. PJ1900134-A, *Plaintiffs-Appellants*, | No. 22-35784  D.C. No. 3:21-cv-05930-DGE  OPINION |

v.

CINDY SMITH, in her official capacity as Chief Judge for the Suquamish Tribal Court; ERIC NIELSEN, in his official capacity as Chief Judge of the Suquamish Tribal Court of Appeals; BRUCE DIDESCH, in his official capacity as Judge of the Suquamish Tribal Court of Appeals; STEVEN D. AYCOCK, in his official capacity as Judge of the Suquamish Tribal Court of Appeals,
            *Defendants-Appellees*,
  and

 SUQUAMISH TRIBE,
            *Intervenor-Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Washington
David G. Estudillo, District Judge, Presiding

Argued and Submitted August 24, 2023
Seattle, Washington

Filed February 29, 2024
Before:  Michael Daly Hawkins, Susan P. Graber, and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Tribal Jurisdiction

The panel affirmed the district court's summary judgment in favor of Suquamish Tribe in an action, brought by several insurance companies and underwriters, seeking a declaratory judgment that the Suquamish Tribal Court lacked subject-matter jurisdiction over the Tribe's suit for breach of contract concerning its insurance claims for lost business and tax revenue and other expenses arising from the suspension of business operations during the onset of the COVID-19 pandemic.

The panel held that the Tribal Court had subject-matter jurisdiction over the Tribe's claim against nonmember off-reservation insurance companies that participated in an insurance program tailored to and offered exclusively to tribes. The panel concluded that the insurance companies' conduct occurred not only on the Suquamish reservation, but also on tribal lands. The panel further concluded that, under the Tribe's sovereign authority over "consensual relationships," as recognized under the first *Montana* exception to the general rule restricting tribes' inherent sovereign authority over nonmembers on reservation lands, the Tribal Court had jurisdiction over the Tribe's suit.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Richard J. Doren (argued), Matthew A. Hoffman, Bradley J. Hamburger, Daniel R. Adler, Patrick J. Fuster, and Kenneth Oshita, Gibson Dunn & Crutcher LLP, Los Angeles, California; Gabriel L. Baker, Jensen Morse Baker PLLC, Seattle, Washington; Michael E. Ricketts, Gordon Thomas Honeywell LLP, Seattle, Washington; Kasie Kashimoto, Kevin J. Kay, Thomas Lether, and Eric J. Neal, Lether Law Group, Seattle, Washington; Robert W. Novasky, Forsberg & Umlauf PS, Tacoma, Washington; for Plaintiffs-Appellants.

Andrew Brantingham (argued), Skip Durocher, and Benjamin Greenberg, Dorsey & Whitney LLP, Seattle, Washington; Timothy W. Woolsey, Office of Tribal Attorney, Squamish, Washington; for Intervenor-Defendant-Appellee.

## OPINION

McKEOWN, Circuit Judge:

Justice Thurgood Marshall once wrote, "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 172 (1973). Yet, a complex history has made federal courts the arbiters of tribal court jurisdiction. This history has also led to the Supreme Court's general rule that restricts tribes' inherent sovereign authority over nonmembers on

reservation lands.  *See Montana v. United States*, 450 U.S. 544, 565 (1981).  Nonetheless, in *Montana,* a "pathmarking case concerning tribal civil authority over nonmembers," *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997), the Court crafted two important exceptions that bring conduct within tribal jurisdiction: "the activities of nonmembers who enter consensual relationships with the tribe or its members" and the conduct of nonmembers that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," 450 U.S. at 565–66.

This appeal involves an insurance claim covering tribal properties on tribal land brought by a tribe and its businesses. We consider whether the tribal court has jurisdiction over this claim against nonmember, off-reservation insurance companies that participate in an insurance program tailored to and offered exclusively to tribes.

Here, several insurance companies and underwriters (collectively, "Lexington") challenge the Suquamish Tribal Court's ("Tribal Court") jurisdiction over an insurance contract suit brought by the Suquamish Tribe ("Tribe") and its businesses.  Since 2015, Lexington has insured the Tribe's properties on tribal lands within the boundaries of the Port Madison Reservation.  After suspending business operations during the onset of the COVID-19 pandemic, the Tribe submitted insurance claims for lost business and tax revenue and other expenses.  Lexington responded with reservation-of-rights letters.  The Tribe then sued Lexington in Tribal Court for breach of contract, and Lexington moved to dismiss for lack of jurisdiction.  The Tribal Court found that it had jurisdiction, and the Suquamish Tribal Court of Appeals affirmed.

Lexington commenced this action in federal court, seeking a declaratory judgment that the Tribal Court is without jurisdiction. On cross-motions for summary judgment, the district court held that the Tribal Court had subject-matter jurisdiction over this dispute. The court granted the Tribe's motion for summary judgment, denied Lexington's motion, and dismissed the case with prejudice to allow proceedings to continue in Tribal Court.

We affirm. The Tribal Court has subject-matter jurisdiction over this matter under the Tribe's sovereign authority over "consensual relationships," as recognized under *Montana*'s first exception. 450 U.S. at 565. Because our decision rests on *Montana*'s first exception, we need not examine the second *Montana* exception or the right to exclude, as discussed in *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011) (per curiam).

## BACKGROUND

The Suquamish Tribe is a federally recognized tribe located in the Puget Sound in Washington State. Pursuant to the Treaty of Point Elliott, the Tribe has sovereign authority over the Port Madison Reservation ("Reservation"). 12 Stat. 927 (1855). The Tribe operates a host of businesses on the Reservation, both directly and through Port Madison Enterprises ("Port Madison"), a tribally chartered economic development entity that is wholly owned by the Tribe and headquartered on tribal trust lands. The businesses, which include a museum, a seafood company, a casino, a hotel, and several gas stations, are all located on tribal trust lands within the boundaries of the Reservation.

Beginning in 2015, the Tribe and Port Madison purchased insurance policies from Lexington Insurance

Company and several other off-reservation insurance companies via an insurance broker. The policies were offered under the Tribal Property Insurance Program ("Tribal Program"), which is administered by Alliant Specialty Services, Inc., under the moniker Tribal First.[1] Tribal First provides insurance and risk management services exclusively to tribal governments and enterprises. Tribal First describes itself as "the largest provider of insurance solutions to Native America and a leader in the specialty areas of tribal business enterprises, including gaming, alternative energy, construction, and housing authorities." Because of this focus on "Native America," Tribal First "structure[s] insurance programs tailored to safeguard both [tribal] operations and [tribal] employees."

Specifically, Tribal First contracts with insurance providers and underwriting services that are willing to provide coverage to tribal entities, and then supplies insureds with the property insurance policies issued by the contracted providers. Tribal First handles the "underwriting, claims/risk management, and administrative services" for the tribal insureds. Lexington is one of these contracted providers. Lexington participated in the Tribal Program to provide insurance to tribal entities, like the Tribe and Port Madison, that signed up with Tribal First. Lexington entered

---

[1] In full, appellants are Lexington Insurance Company ("Lexington"); Homeland Insurance Company of New York; Hallmark Specialty Insurance Company; Aspen Specialty Insurance Company; Aspen Insurance UK Limited; Syndicate 1414; Syndicate 510; XL Catlin Insurance Company UK Limited; Syndicate 4444; Syndicate 2987; Endurance Worldwide Insurance Limited (last six collectively referred to as "Certain Underwriters as Lloyd's, London and London Market Companies Subscribing to Policy Nos. PJ193647, PJ1900131, PJ1933021, PD-10364-05, PD-11091-00, and PJ1900134-A").

into a contract with Alliant and issued insurance policies—based on underwriting guidelines specifically negotiated for the Tribal Program—that were provided through Tribal First to the tribal entities.

The relevant insurance policies named Lexington as the insurer and the Tribe, Port Madison, and various subsidiaries—all located on tribal trust lands within the Reservation—as the insureds.  In addition to being listed on the evidence-of-coverage letters and the policies' declaration pages as the insurer, Lexington knew it was insuring the Tribe and Port Madison.  The "All Risk" policies issued by Lexington provided broad coverage for losses to the Tribe's and Port Madison's businesses and properties.  The policies covered "all risks of physical loss or damage" to "property of every description both real and personal" located on the trust lands, as well as interruptions to business and tax revenues generated within the Reservation.  Overall, the policies covered almost $242 million worth of real property, $50 million worth of personal property, and $98 million of business interruption value—all centered on Tribal trust lands—for the Tribe and Port Madison.

In March 2020, in response to the outbreak of COVID-19, the Suquamish Tribal Council passed several resolutions that declared a public health emergency, restricted access to certain public facilities operated by Port Madison, and suspended operations at all tribal businesses on the Reservation.  Eventually the Tribal Council initiated a phased reopening plan for these businesses.  As a result of these closures and the pandemic, the Tribe and Port Madison allege various injuries, including damage to the buildings on trust lands, loss of business income and tax revenue, and costs associated with disinfecting and sanitizing the business

premises.  In an effort to recoup these losses, the Tribe and Port Madison submitted claims for coverage under the Lexington insurance policies.  Lexington responded to these claims by issuing reservation-of-rights letters, contending that the policies may not cover COVID-19-related losses.  The merits of the coverage claims are not before us.

The Tribe and Port Madison then sued Lexington in the Tribal Court, claiming breach of contract and seeking a declaratory judgment that the insurers were obligated to compensate them for the full amount of their pandemic-related losses.  Lexington, in its motion to dismiss the complaint, argued that the Tribal Court did not have personal or subject-matter jurisdiction.  In denying the motion, the Tribal Court found that it had jurisdiction based on the Tribe's inherent right to exclude and the consensual-relationship exception set forth in *Montana*, 450 U.S. at 565–66.  The Suquamish Tribal Court of Appeals affirmed the Tribal Court's denial of Lexington's motion to dismiss on the same grounds.  The parties agreed to stay further proceedings in the Tribal Court so Lexington could pursue this action in federal court.

In December 2021, Lexington initiated this suit in the Western District of Washington, seeking a declaratory judgment that the Tribal Court lacks jurisdiction over Lexington.  The complaint named the judges of the Tribal Court and Tribal Court of Appeals as defendants, and in March 2022, the Suquamish Tribe intervened as a defendant.[2]

---

[2] The individual defendants-appellees are Cindy Smith, Chief Judge, Suquamish Tribal Court; Eric Nielsen, Chief Judge, Suquamish Tribal Court of Appeals; and Bruce Didesch and Steve Aycock, Judges, Suquamish Tribal Court of Appeals.

On cross-motions for summary judgment on the jurisdictional issues, the district court granted the Tribe's motion for summary judgment and denied Lexington's motions.  In rejecting Lexington's argument that its conduct did not take place on tribal land, the court held that the provision of insurance to businesses owned by the Tribe and to properties located on Tribal land qualified as conduct that is subject to tribal adjudicative jurisdiction under the right to exclude.  The court also held that the first *Montana* exception applied and that the Tribal Court had personal jurisdiction over the insurers.  The court then dismissed the case with prejudice.  On appeal, Lexington argues that the Tribal Court lacks subject-matter jurisdiction over the insurers.

## ANALYSIS

### I.   Federal Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291.  It is well settled that the issue of "whether a tribal court has adjudicative authority over nonmembers is a federal question." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008); *see also Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 852–53 (1985).  We review de novo this question of law, and we review for clear error the Tribal Court's factual findings. *FMC Corp. v. Shoshone-Bannock Tribes*, 942 F.3d 916, 930 (9th Cir. 2019).

Our review, however, is not free-ranging.  We must keep in mind that "because tribal courts are competent law-applying bodies, the tribal court's determination of its own jurisdiction is entitled to 'some deference.'" *Water Wheel*, 642 F.3d at 808 (quoting *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313 (9th Cir. 1990)).  We also are mindful

of the longstanding "federal policy of deference to tribal courts."  *Id.* (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 17 (1987)).  While undertaking our duty to determine the scope of tribal jurisdiction over nonmembers, our review proceeds with proper respect for both the Tribal Court's authority over reservation affairs and federal promotion of tribal self-government.  *See Iowa Mutual*, 480 U.S. at 16–17.

## II.  Sources of Tribal Authority

Our analysis of a tribe's civil jurisdiction over nonmembers is rooted in several longstanding principles.  The most important of these principles is that "Indian tribes have long been recognized as sovereign entities, 'possessing attributes of sovereignty over both their members and their territory.'"  *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 591 (9th Cir. 1983) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).  As the Supreme Court has reinforced, "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."  *Wheeler*, 435 U.S. at 323.  But even in the face of these broad propositions, "tribes do not, as a general matter, possess authority over [nonmembers] who come within their borders." *Plains Commerce*, 554 U.S. at 328.  In determining whether tribal court jurisdiction over nonmembers exists, we look to the "outer boundaries" of tribal sovereignty.  *Knighton v. Cedarville Rancheria of N. Paiute Indians*, 922 F.3d 892, 899 (9th Cir. 2019).

Several principles shape those outer boundaries.  First, tribal jurisdiction is "cabined by geography": a tribe's jurisdiction cannot extend past the boundaries of the reservation.  *Philip Morris USA, Inc. v. King Mountain*

*Tobacco Co.*, 569 F.3d 932, 938 (9th Cir. 2009). This is, indeed, a prerequisite to tribal jurisdiction. If the nonmember's conduct occurred not only within the boundaries of the reservation, but on tribal land, then a presumption of tribal jurisdiction applies. *See Strate*, 520 U.S. at 454 ("We can readily agree, in accord with *Montana*, that tribes retain considerable control over nonmember conduct on tribal land." (cleaned up)); *Plains Commerce*, 554 U.S. at 328 ("Our cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it.") (citations omitted). Thus, the conduct must have occurred within the boundaries of the reservation, and if the conduct occurred on tribal land, then the scales tip sharply toward tribal jurisdiction.

Once we have determined that the nonmember's conduct has occurred within the boundaries of the reservation, we must further examine the tribe's exercise of power, keeping in mind that a tribe's adjudicative jurisdiction cannot exceed its legislative jurisdiction. *Strate*, 520 U.S. at 453. Accordingly, to determine whether a tribe has adjudicative, or subject-matter, jurisdiction over nonmembers, we first inquire whether a tribe has regulatory authority over the activities of those nonmembers. *See id.* at 453 ("Where tribes possess authority to regulate the activities of nonmembers, 'civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts.'" (quoting *Iowa Mutual*, 480 U.S. at 18) (cleaned up)).

We have recognized two independent sources of a tribe's regulatory power over nonmembers: inherent sovereign authority and the power to exclude. The first source is a tribe's inherent sovereign authority to protect self-government and control internal relations, an authority encapsulated in the two *Montana* exceptions. *See Montana*,

450 U.S. at 565–66; *Knighton*, 922 F.3d at 895, 903–05. The second source of regulatory power is a tribe's inherent power to exclude nonmembers from tribal land, deriving from the tribe's status as a sovereign and a landowner. *See Water Wheel*, 642 F.3d at 814; *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982). Accordingly, we will uphold a tribal court's exercise of civil jurisdiction over nonmembers if a tribe's regulatory authority—and by extension, its adjudicative authority—is supported by either of the *Montana* exceptions or the power to exclude.

## III.   Conduct on Tribal Lands

The question whether conduct occurred on tribal land—where the exercise of tribal jurisdiction is the strongest—and therefore took place within the bounds of the reservation underlies our jurisdictional analysis. We conclude that Lexington's conduct occurred not only on the reservation, but on tribal lands.

A tribe's regulatory authority over a nonmember is triggered when "the nonmember enters tribal lands or conducts business with the tribe." *Merrion*, 455 U.S. at 142. Lexington clearly made itself subject to the Tribe's authority by "conduct[ing] business with the tribe." *See id.* Lexington held itself out as a potential business partner to tribes by entering into a contract with Tribal First. Lexington then cemented that business relationship with the Tribe and Port Madison—a tribally owned entity—when it issued the insurance policies, which had been developed by Lexington specifically for tribes and which listed Lexington as the insurer. This business relationship was ongoing: not only did Lexington continue to renew the insurance policies annually from 2015 onward as the Tribe and Port Madison paid premiums, but the Tribe and Port Madison also

submitted their insurance claims to the company authorized by Lexington to process the claims on its behalf.

The facts of this case closely align with those in *Merrion v. Jicarilla Apache Tribe*, the defining case for tribal authority over tribal lands. In *Merrion*, the Court upheld the Jicarilla Apache Tribe's imposition of a severance tax on nonmember companies that had contracted with the Apache Tribe to extract oil and gas from tribal land. 455 U.S. at 135–36, 144. Although the companies' employees entered tribal lands to extract the resources, the Court did not solely rely on this fact; it specifically pointed to the Apache Tribe's sovereign power over commercial agreements as derivative of a tribe's power to exclude on tribal lands. *Id.* at 145–48 (distinguishing between "the sovereign nature of the tribal authority to tax" and a private "landowner's contractual right"). Thus, the Court held that the nonmember companies were subject to tribal jurisdiction when the commercial relationship between the companies and the tribe centered on tribally owned resources on tribal land. *Id.* at 135–36, 144. Here, the commercial relationship at issue—an insurance contract—is also between a nonmember company—Lexington—and a tribe—the Suquamish Tribe—and involves tribally owned buildings and businesses located on tribal trust land. Lexington's provision of insurance was therefore the type of business conduct on tribal land that the Court contemplated in *Merrion*.

Importantly, we have held that tribal regulatory authority is proper when a nonmember's conduct relates to tribal lands. We have explained that "[o]ur inquiry is not limited to deciding when and where the claim arose," but also considers "whether the cause of action brought by the[ ] parties *bears some direct connection to tribal lands*." *Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1135 (9th Cir. 2006)

(en banc) (emphasis added); *Knighton*, 922 F.3d at 901–02; *see also Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1205 (9th Cir. 2013) (holding that tribal jurisdiction is plausible when "the dispute *centers on [tribal] trust land*" (emphasis added)).

The unique facts of the Tribe's suit against Lexington satisfy, and even exceed, the requirement that the claims bear "some direct connection to tribal lands." *Knighton*, 922 F.3d at 902. To begin, Lexington's business conduct with the Tribe and Port Madison is directly connected to tribal lands—the insurance policies cover the Tribe's and Port Madison's businesses and properties on the Tribe's trust lands. Additionally, this breach-of-contract dispute centers on whether these policies cover the losses and expenses incurred by those businesses and properties on the trust lands. Tribal land literally and figuratively underlies the contract at issue here. What could be more quintessentially tribal-land-based than an insurance policy covering buildings and businesses on tribal land? We would be ignoring *Merrion* and our own precedent to conclude that a suit over a commercial agreement that solely involves tribal property on trust land does not fulfill the territorial component for finding that nonmember conduct occurred on tribal land.

Any suggestion that Lexington cannot be subject to tribal jurisdiction because all relevant conduct occurred off the Reservation—and neither Lexington nor its employees were ever physically present there—misreads our caselaw. The foundational rule in *Merrion* states that a tribe has regulatory jurisdiction over a nonmember who "enters tribal lands *or conducts business with the tribe*." 455 U.S. at 142 (emphasis added). Nowhere in *Merrion* or in subsequent cases has the Court limited the definition of nonmember conduct on tribal

land to physical entry or presence. Rather, the Court has explicitly recognized that a nonmember *either* entering tribal lands *or* conducting business with a tribe can make that person subject to a tribe's regulatory authority. We take the Court at its word.

It is easy to understand why the Court makes this distinction between physical entry and business conduct. Nonmembers may enter tribal lands or travel on tribal roads without conducting business with the tribe or tribal members. And when these nonmembers commit torts or trespass on tribal lands, the tribe may exercise its civil jurisdiction over them. *See McDonald v. Means*, 309 F.3d 530, 537–40 (9th Cir. 2002) (holding that a tribal court had jurisdiction over a suit between a tribal member and a nonmember arising from an accident on a tribal road); *see also Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 849–50 (9th Cir. 2009) (holding that tribal court jurisdiction over a nonmember who trespassed on tribal lands was plausible). On the other hand, a tribe may regulate nonmembers' contractual relationships with the tribe or tribal members apart from any physical entry that takes place under those contracts. Thus, for example, tribes can impose taxes on the value of nonmembers' leasehold interests on tribal lands. *See Kerr-McGee Corp. v. Navajo Tribe of Indians*, 731 F.2d 597, 599–600 (9th Cir. 1984) (upholding tribe's possessory interest tax imposed on nonmember corporation's mining leases on tribal lands), *aff'd*, 471 U.S. 195 (1985).

The tribes' ability to regulate such consensual relationships makes sense in our contemporary world in which nonmembers, through the phone or internet, regularly conduct business on a reservation and significantly affect a tribe and its members without ever physically stepping foot

on tribal land.  In sum, a nonmember's business with a tribe may very well trigger tribal jurisdiction—even when the business transaction does not require the nonmember to be physically present on those lands.

Although our previous cases upholding tribal jurisdiction over nonmembers involved some form of physical presence, we have never stated that physical presence is necessary to conclude that nonmember conduct occurred on tribal land.  Rather, we have repeatedly stated that "[o]ur inquiry is not limited to deciding when and where the claim arose" but "whether the cause of action brought by the[ ] parties *bears some direct connection to tribal lands*." *Smith*, 434 F.3d at 1135 (emphasis added).

In *Smith*, we concluded that a tribal court had jurisdiction over a nonmember's claims arising from an accident that occurred on a federal highway when the vehicle was maintained and the accident investigated by a tribal college situated on tribal lands.  *Id.*  In *Knighton*, yet another case implicating the role of tribal land, we similarly held that a tribe's suit against a nonmember tribal employee who worked off the reservation related to tribal lands.  *Knighton*, 922 F.3d 901–02.  There, we pointed to the employee's involvement in moving the tribe's headquarters from tribal land on the reservation to off-reservation fee land.  *Id.*  The teaching from these cases is that, even if Lexington employees never entered the Reservation, Lexington's insurance coverage of the Tribe's and Port Madison's businesses on trust lands relates directly to tribal lands and conforms with our precedent.

Cases from other circuits strengthen our conclusion.  In *Attorney's Process & Investigation Services, Inc. v. Sac & Fox Tribe*, the Eighth Circuit remanded a claim to determine

whether "the conversion claim has a sufficient nexus to the consensual relationship between [the parties]" and could be subject to tribal jurisdiction. 609 F.3d 927, 941 (8th Cir. 2010). There, the tribe had failed to delineate the relationship between the claim and the nonmember entity's services on tribal land. *Id.* In contrast, the Suquamish Tribe has provided a clear nexus between its breach-of-contract claim and Lexington's coverage of tribal properties on tribal land. *See also, e.g.*, *DISH Network Serv. LLC v. Laducer*, 725 F.3d 877, 884 (8th Cir. 2013) (holding that tribal jurisdiction over an abuse-of-process tort against a nonmember company, even if it occurred off tribal lands, would "not clearly be lacking" because "the tort claim arises out of and is intimately related to [the contract] and that contract relates to activities on tribal land").

Contrasting the core of this appeal—a contract centered on insuring tribal properties on tribal land—to other circuits' cases underscores the distinction between the nexus to conduct on tribal land and conduct that could not even plausibly be viewed as connected to tribal land. *See Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 189, 207–08 (7th Cir. 2015) (holding no tribal jurisdiction over nonmembers who issued bonds for a tribe's off-reservation investment project); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 768 (7th Cir. 2014) (holding no tribal jurisdiction over suit brought by off-reservation nonmembers against on-reservation tribal lenders when the loan transactions were completed online); *MacArthur v. San Juan County*, 497 F.3d 1057, 1060–61 (10th Cir. 2007) (holding no tribal jurisdiction over tribal member employees' suit against nonmember clinic operated on non-Indian fee land).

We easily conclude that Lexington's business relationship with the Tribe satisfies the requirements for conduct occurring on tribal land, thereby occurring within the boundaries of the reservation and triggering the presumption of jurisdiction.  We turn next to the Tribe's inherent sovereign authority as a basis for jurisdiction.

## IV.  Tribal Jurisdiction Under the First *Montana* Exception

In *Montana*, the Supreme Court affirmed that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands."  450 U.S. at 565.  More than twenty years later, the Court explained that "the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations."  *Plains Commerce*, 554 U.S. at 337.  We have described this inherent sovereign power as encapsulated in the two "*Montana* exceptions," which "are 'rooted' in the tribes' inherent power to regulate nonmember behavior that implicates these sovereign interests" in protecting self-government and controlling internal relations.  *Knighton*, 922 F.3d at 904 (quoting *Attorney's Process*, 609 F.3d at 936); *see also Montana*, 450 U.S. at 565–66 (describing the exceptions to "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe").

Under the first *Montana* exception, a "tribe may regulate . . . the activities of nonmembers who enter consensual relationships with the tribe or its members."  *Montana*, 450 U.S. at 565.  And under the second exception, a tribe may "exercise civil authority over the conduct of non-

Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566.

Although we early on characterized the *Montana* framework as applicable only to tribal jurisdictional issues on non-tribal, or non-Indian fee, land, we clarified our view in *Knighton*. In *Knighton*, we spelled out that *Water Wheel* and "our subsequent cases involving tribal jurisdictional issues on tribal land do not exclude *Montana* as a source of regulatory authority over nonmember conduct on tribal land." 922 F.3d at 903; *see Water Wheel*, 642 F.3d at 810. Rather, the *Montana* exceptions allow us to determine the scope of a tribe's "general jurisdictional authority" over nonmember conduct, whether it be on tribal or non-tribal land. *Water Wheel*, 642 F.3d at 810.

## A.  Regulatory and Adjudicative Jurisdiction

Under *Montana*'s first exception, a "tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U.S. at 565. For the purposes of determining whether a consensual relationship exists, "consent may be established 'expressly or by [the nonmember's] actions.'" *Water Wheel*, 642 F.3d at 818 (quoting *Plains Commerce*, 554 U.S. at 337).

Lexington's insurance contract with the Tribe squarely satisfies *Montana*'s consensual-relationship exception. The insurance policy establishes a contract between Lexington as the insurer and the Tribe, Port Madison, and subsidiary entities as beneficiaries. In exchange for coverage, Lexington received premiums from the Tribe and Port

Madison, and Lexington renewed the policies many times over the course of several years. Thus, Lexington entered into a "relationship[ ] with the tribe . . . through commercial dealing [and] contracts." *See Montana*, 450 U.S. at 565. There is no dispute that the relationship was mutual and consensual.

We must also "consider the circumstances and whether under those circumstances the non-Indian defendant should have reasonably anticipated that his interactions might 'trigger' tribal authority." *Water Wheel*, 642 F.3d at 818 (quoting *Plains Commerce*, 554 U.S. at 338). It should have been no surprise to Lexington that its contract with the Tribe would trigger tribal authority. The transaction had tribe and tribal lands written all over it. Because of its participation in the Tribal Program—an insurance program marketed specifically to tribes—Lexington was objectively on notice that it was taking advantage of a program targeted at providing insurance to tribes. Additionally, Lexington knew that it was contracting with the Tribe to provide insurance coverage for businesses and properties on tribal trust land.[3] *See id.* at 817 (holding that a consensual relationship was

---

[3] We agree with Lexington that, in its *Montana* analysis, the district court improperly relied on the insurance policies' service-of-suit clause, which provided that the parties would submit to a court of competent jurisdiction. That clause does not identify a specific court. Rather, this clause would allow the suit to proceed in tribal court if the tribal court has subject-matter jurisdiction. It is circular reasoning to conclude that the clause itself gives a tribal court jurisdiction when the thrust of this federal court case is whether the Tribal Court has jurisdiction in the first place and therefore qualifies as a "court of competent jurisdiction." *See Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 92 (2017) ("[T]he phrase 'court of competent jurisdiction' [refers] to a court with an existing source of subject-matter jurisdiction.").

established when the nonmember "corporation had full knowledge the leased land was tribal property").

As a sophisticated commercial actor conducting business with tribes, Lexington could not have ignored tribes' status as sovereigns that retain jurisdiction over nonmembers in certain circumstances. Nor could Lexington have disregarded the fact that tribal courts have long adjudicated suits involving nonmembers. *See, e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 (1978) ("Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians."). As we counseled in *Smith*, nonmembers are on notice that should they "choose to affiliate with" tribes through a consensual relationship, they "may anticipate tribal jurisdiction when their contracts affect the tribe." 434 F.3d at 1138. In entering into a contract with the sovereign Tribe that bore a direct connection to and could affect the Tribe's properties on trust land, Lexington should have reasonably anticipated that it could be subject to tribal jurisdiction.

Finally, we address the nexus requirement. "*Montana*'s consensual-relationship exception requires that 'the regulation imposed by the Indian tribe have a nexus to the consensual relationship itself.'" *Knighton*, 922 F.3d at 904 (quoting *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001)). The nexus between Lexington's consensual relationship with the Tribe and the conduct that the Tribe seeks to regulate is no mystery. The consensual relationship is embodied in an insurance contract involving tribal lands, and the Tribe seeks to regulate the scope of insurance coverage that Lexington was bound to provide under that contract. *See Water Wheel*, 642 F.3d at 818–19 (stating that

either *Montana* exception would provide jurisdiction over a breach-of-contract claim when "the commercial dealings between the tribe and [the nonmember] involved the use of tribal land, one of the tribe's most valuable assets"). We conclude that the Tribe has regulatory jurisdiction over Lexington under *Montana*'s first exception.

The Supreme Court has counseled that should a consensual relationship exist and "tribes possess authority to regulate the activities of nonmembers, 'civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts.'" *Strate*, 520 U.S. at 453 (quoting *Iowa Mutual*, 480 U.S. at 18) (cleaned up). When regulatory jurisdiction exists, important sovereign interests are at stake, and "long-standing Indian law principles recognizing tribal sovereignty" are implicated, a tribe possesses adjudicative jurisdiction. *Water Wheel*, 642 F.3d at 816.

Because the Tribe has regulatory jurisdiction over Lexington, and considering the nature of the Tribe's cause of action, the Tribal Court presumptively has adjudicative jurisdiction over this dispute. Tribal Court jurisdiction over the breach-of-contract suit would not exceed the Tribe's ability to regulate the contract. *See Strate*, 520 U.S. at 453 (stating that "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction"); *see also Knighton*, 922 F.3d at 906 (holding that a tribal court had authority to adjudicate claims arising from an employee's breach of Tribal employee standards of conduct, which the Tribe had the power to regulate). Because the Tribe's sovereign interest in managing its businesses on tribal lands is at stake, tribal sovereignty principles are implicated. *See Plains Commerce*, 554 U.S. at 334 (identifying "managing tribal lands" as one of tribes' "sovereign interests"); *Merrion*, 455 U.S. at 137 (recognizing a "tribe's general authority, as

sovereign, to control economic activity within its jurisdiction"). Therefore, the Tribal Court has jurisdiction under the first *Montana* exception in view of the Tribe's regulatory authority coupled with its adjudicative jurisdiction over Lexington.

## B. Sovereignty Considerations under *Montana*

Our holding of tribal jurisdiction conforms with precedent counseling respect for tribal sovereignty—including the competency of tribal governments—while affirming the limited scope of tribal jurisdiction over nonmembers under *Montana*. Lexington's suggestion to the contrary misreads our case law.

Consideration of the political structure of tribal governments, including their judicial systems, has no place in our *Montana* analysis. There is no merit to Lexington's suggestion that the Tribal Court should not adjudicate this suit because of the "hometown" advantage and control exercised by the Suquamish Tribal Council over the Tribal Court judges, the exclusion of nonmembers from Tribal juries, and the threat to Lexington's due-process rights posed by Tribal Court judges and juries selected by the Tribe to rule on its own claims. The Supreme Court, our circuit, and our sister circuits have rejected such attacks on tribal judiciaries time and time again in light of federal law guaranteeing due-process rights in tribal courts, as well as empirical studies and judicial experience showing that "tribal courts do not treat nonmembers unfairly." *FMC*, 942 F.3d at 943–44 (collecting cases from the Supreme Court and other circuits).

Nor does the current state of the insurance regulatory regime—namely states' near-exclusive regulation of insurance and the Tribe's lack of insurance regulations—

serve as a counterweight to an anticipation of tribal jurisdiction. We have never held that a tribe must possess positive law addressing certain conduct to exercise jurisdiction over that conduct. Rather, we have embraced the opposite: so long as federal law determines that a tribe has authority to regulate and adjudicate certain conduct, it makes no difference whether a tribe does so based on positive law or another source of law, like tort law, or in this case, contract law. *See Knighton*, 922 F.3d at 906–07.

We also do not countenance Lexington's argument that *Plains Commerce* imposed an additional limitation on the *Montana* exceptions, namely that the tribal regulation must not only satisfy *Montana* but also "stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." 554 U.S. at 337. This argument misreads *Plains Commerce*. As we explained in *Knighton*, the Court was only affirming the "varied sources of tribal regulatory power over nonmember conduct on the reservation" with that statement in *Plains Commerce*. 922 F.3d at 903 (citing *Plains Commerce*, 554 U.S. at 337). The Court was not imposing a supplemental requirement to the *Montana* analysis. Rather, it was merely stating that even if a nonmember consented to tribal law, the tribe could impose that law on the nonmember only if the tribe had the authority to do so under the power to exclude—the "authority to set conditions on entry"—or the *Montana* exceptions—the authority to "preserve tribal self-government[ ] or internal relations." *Plains Commerce*, 554 U.S. at 337 (citing *Montana*, 405 U.S. at 564); *see also Knighton*, 922 F.3d at 904 ("The *Montana* exceptions are 'rooted' in the tribes' inherent power to regulate nonmember behavior that implicates these sovereign interests." (quoting *Attorney's*

*Process*, 609 F.3d at 936)). If the conduct at issue satisfies one of the *Montana* exceptions, it necessarily follows that the conduct implicates the tribe's authority in one of the areas described in *Plains Commerce*.[4] Because Lexington's conduct satisfies the consensual-relationship exception, it implicates the Tribe's authority over self-government and internal relations.

Finally, our holding does not construe *Montana*'s first exception "in a manner that would swallow the rule or severely shrink it." *Plains Commerce*, 554 U.S. at 330 (internal quotation marks and citations omitted). The circumstances in this case resulting in tribal jurisdiction are narrow: the nonmember consensually joined an insurance pool explicitly marketed to tribal entities; the nonmember then entered into an insurance contract with a tribe; the contract exclusively covered property located on tribal lands; and the tribe's cause of action against the nonmember arose directly out of the contract. In *Allstate Indemnity Company v. Stump*, we deemed tribal jurisdiction over an off-reservation insurance company as "colorable," even when the insurance was purchased by a tribal member

---

[4] Our understanding of *Plains Commerce* aligns with that of the Fifth Circuit. *See Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167, 174–75 (5th Cir. 2014) ("We do not interpret *Plains Commerce* to require an additional showing that one specific relationship, in itself, 'intrude[s] on the internal relations of the tribe or threaten[s] self-rule.'" (quoting *Plains Commerce*, 554 U.S. at 337)), *aff'd by an equally divided court*, 579 U.S. 545 (2016); *see also id.* at 175 (stating that the limitations expressed in *Plains Commerce* are "already built into the first *Montana* exception"). However, this understanding departs from that of the Seventh Circuit. *See Jackson*, 764 F.3d at 783 (holding that, beyond nonmember consent, the tribal members also had to make a showing that the dispute implicated an aspect of the tribe's sovereign authority as stated in *Plains Commerce*).

outside the reservation. 191 F.3d 1071, 1074–76 (9th Cir. 1999). The situation here rises from colorable to actual. We conclude that under the circumstances, the Tribe decidedly has jurisdiction over an off-reservation insurance company.

Importantly, we do not suggest that an off-reservation nonmember company may be subject to tribal jurisdiction anytime it does business with a tribe or tribal member or provides goods or services on tribal lands. Our analysis does not deal with the mine run of contracts. Such a generalization would swallow the rule. Rather, the *Montana* framework requires a factual inquiry into each component— the existence of a consensual relationship, the nonmember's anticipation of tribal jurisdiction, and the nexus between the relationship and the conduct being regulated. The circumstances here telescope the close nexus between tribal land and the consensual transaction. We emphasize that tribal jurisdiction is proper because the relevant insurance policy covers the properties and operations of a tribal government and businesses that extensively "involved the use of tribal land" and the businesses "constituted a significant economic interest for the tribe." *Water Wheel*, 642 F.3d at 817. Any concern regarding the scope of *Montana* is quelled by the reminder that sophisticated commercial actors, such as insurers, can easily insert forum-selection clauses into their agreements with tribes and tribal members, thereby precluding the exercise of tribal court jurisdiction in such circumstances. *See, e.g.*, *Plains Commerce*, 554 U.S. at 346 (Ginsburg, J., concurring in part) (stating that a nonmember company can include "forum selection, choice-of-law, or arbitration clauses in its agreements" with tribal members to avoid tribal court and the application of tribal law).

Ultimately, the *Montana* exceptions ensure that a tribe's exercise of authority over nonmembers is limited to a tribe's "sovereign interests" in "managing tribal land, protecting tribal self-government, and controlling internal relations." *Id.* at 334 (cleaned up). Because this case squarely fits into the first *Montana* exception, the jurisdiction recognized here flows from the Suquamish Tribe's retained sovereignty. *See Montana*, 405 U.S. at 565 ("Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations . . . .").

### CONCLUSION

We agree with the Tribal Court, the Suquamish Tribal Court of Appeals, and the district court that the Tribal Court has subject-matter jurisdiction over this suit pursuant to the Tribe's inherent sovereign power under the first *Montana* exception. Our inquiry is at an end, and the case can proceed under the jurisdiction and laws of the Suquamish Tribe.

**AFFIRMED.**