**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY; HOMELAND INSURANCE COMPANY OF NEW YORK; HALLMARK SPECIALTY INSURANCE COMPANY; ASPEN SPECIALTY INSURANCE COMPANY; ASPEN INSURANCE UK LTD; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON MARKET COMPANIES SUBSCRIBING TO POLICY NO. PJ193647; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. PJ1900131; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON MARKET COMPANIES SUBSCRIBING TO POLICY NO. PJ1933021; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NOS. PD-10364-05 AND PD-11091-00; ENDURANCE WORLDWIDE INSURANCE LIMITED T/AS SOMPO INTERNATIONAL SUBSCRIBING TO POLICY NO. PJ1900134-A, | No.22-35784<br><br>D.C. No. 3:21-cv-05930-DGE<br><br>ORDER |

*Plaintiffs-Appellants*,

 v.

CINDY SMITH, in her official capacity as Chief Judge for the Suquamish Tribal Court; ERIC NIELSEN, in his official capacity as Chief Judge of the Suquamish Tribal Court of Appeals; BRUCE DIDESCH, in his official capacity as Judge of the Suquamish Tribal Court of Appeals; STEVEN D. AYCOCK, in his official capacity as Judge of the Suquamish Tribal Court of Appeals,

            *Defendants-Appellees*,

 and

SUQUAMISH TRIBE,

            *Intervenor-Defendant-Appellee*.

Filed September 16, 2024

Before:  Michael Daly Hawkins, Susan P. Graber, and M. Margaret McKeown, Circuit Judges.

Order;
Statement by Judges Hawkins, Graber, and McKeown;
Dissent by Judge Bumatay

## SUMMARY[*]

### Tribal Jurisdiction

The panel filed an order denying a petition for panel rehearing and rehearing en banc following the panel's opinion affirming the district court's summary judgment in favor of Suquamish Tribe in an action brought by several insurance companies and underwriters, seeking a declaratory judgment that the Suquamish Tribal Court lacked subject-matter jurisdiction over the Tribe's suit for breach of contract concerning its insurance claims for lost business and tax revenue and other expenses arising from the suspension of business operations during the onset of the COVID-19 pandemic.

In its opinion, the panel held that the Tribal Court had subject-matter jurisdiction over the Tribe's claim against nonmember off-reservation insurance companies that participated in an insurance program tailored to and offered exclusively to tribes. The panel concluded that the insurance companies' conduct occurred not only on the Suquamish reservation, but also on tribal lands. The panel further concluded that, under the Tribe's sovereign authority over "consensual relationships," as recognized under the first

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Montana* exception to the general rule restricting tribes' inherent sovereign authority over nonmembers on reservation lands, the Tribal Court had jurisdiction over the Tribe's suit.

In a statement respecting the denial of rehearing en banc, the panel, joined by Chief Judge Murguia and Judges Tashima, Wardlaw, W. Fletcher, Gould, Paez, Berzon, Christen, Hurwitz, Koh, Sanchez, Mendoza, and Desai, wrote that the facts of the case pointed to one conclusion—tribal jurisdiction was appropriate under Supreme Court precedent. The panel wrote that Lexington Insurance Co. explicitly held itself out as a potential partner to tribes, tailored its insurance policies specifically for tribes and tribal businesses, knowingly contracted with the Suquamish Tribe and its chartered economic development entity over a series of years to provide coverage for properties and businesses on Tribal trust lands and then denied claims arising from losses on the Reservation. The panel wrote that, in its opinion, confining itself to these facts, it faithfully applied Supreme Court and circuit precedent in holding that Lexington's actions qualified as conduct on tribal lands and made Lexington subject to tribal jurisdiction.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, Ikuta, R. Nelson, VanDyke, and Collins as to Part III.B only, wrote that, in holding that the tribal court had jurisdiction over the nonmember insurance company, the panel defied both the Constitution and Supreme Court precedent. Judge Bumatay wrote that the panel gutted any geographic limits of tribal court jurisdiction and also significantly expanded the substantive scope of tribal regulatory authority over nonmembers. In Part III.A, Judge Bumatay wrote that *Montana*'s consensual-relationship exception did not apply.

In Part III.B, Judge Bumatay wrote that under *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316 (2008), the case did not meet the additional requirement that tribal assertion of regulatory authority over nonmembers must be connected to the right of Indians to make their own laws and be governed by them.

## ORDER

The panel unanimously voted to deny the petition for panel rehearing. Judges Hawkins, Graber, and McKeown recommended denial of the petition for rehearing en banc. The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the active judges in favor of en banc consideration. Fed. R. App. P. 35. The petition for panel rehearing and rehearing en banc, Dkt. #44, is DENIED.

HAWKINS, GRABER and McKEOWN, Circuit Judges, joined by MURGUIA, Chief Judge, and TASHIMA, WARDLAW, FLETCHER, GOULD, PAEZ, BERZON, CHRISTEN, HURWITZ, KOH, SANCHEZ, MENDOZA, and DESAI, Circuit Judges, respecting the denial of rehearing en banc:

The facts of this case point to one conclusion—tribal jurisdiction is appropriate under Supreme Court precedent. The tailored tribal insurance policy from insurance companies offering specialized tribal coverage for tribal property, and the transactions surrounding these polices have "tribal" written all over them: Tribal First is an entity set up

to offer insurance for tribes. *Lexington Ins. Co. v. Smith*, 94 F.4th 870, 877 (9th Cir. 2024). Lexington Insurance Company and several other insurance companies (collectively, "Lexington") contracted with Tribal First to offer insurance policies to tribal governments and enterprises. *Id.* Lexington then issued insurance policies—based on underwriting guidelines specifically negotiated for the Tribal Property Insurance Program—that were to be provided through Tribal First to tribes. *Id.*

Lexington explicitly held itself out as a potential business partner to tribes, tailored its insurance policies specifically for tribes and tribal businesses, knowingly contracted with the Suquamish Tribe ("Tribe") and its chartered economic development entity, Port Madison Enterprises ("Port Madison"), over a series of years to provide coverage for properties and businesses on Tribal trust lands, including almost $242 million worth of real property, and then denied claims arising from losses on the Reservation. *Id.* at 876–77. And the panel—confining itself to these facts—faithfully applied Supreme Court and circuit precedent in holding that Lexington's actions qualified as conduct on tribal lands and made Lexington subject to tribal jurisdiction.

Judge Bumatay's recasting of this case endeavors to reshape the record. He also sidesteps the Supreme Court's and our circuit's tribal jurisdiction precedent. His claim that the panel "gutted any geographic limits of tribal court jurisdiction" is unfounded. Dissent from the Denial of Rehearing En Banc at 20. The panel concluded that Lexington's relationship with the Tribe and Port Madison and the breach of contract action bear a "direct connection to tribal lands," fulfilling this circuit's test. *Lexington*, 94 F.4th at 880–81 (quoting *Knighton v. Cedarville Rancheria*

*of N. Paiute Indians*, 922 F.3d 892, 902 (9th Cir. 2019)). That connection coupled with Lexington's "conduct[ing] business with the tribe[ ]" fulfills the Supreme Court's directives in *Montana v. United States*, 45 U.S. 544, 565-66 (1980) and *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982).

Contrary to Judge Bumatay's assertions, no tribal jurisdiction case from the Supreme Court or this court has ever held that nonmember *conduct* on tribal land equates to *physical presence* on that land. Instead of turning to precedent, Judge Bumatay resorts to history and endeavors to impugn the legitimacy of tribal courts. But the history he reviews is neither controlling nor persuasive under our tribal jurisdiction precedent. Ultimately, it is difficult to understand why providing insurance policies that exclusively cover tribal property on trust land should not count as conduct occurring on tribal land.

Judge Bumatay's second point—that the panel's failure to engage in a separate inquiry under *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008), "puts us on the wrong side of a circuit split"—is not faithful to a plain reading of *Plains Commerce* or our controlling precedent in *Knighton*. Dissent at 21. The Fifth and Ninth Circuits have rejected the separate inquiry notion as a misreading of *Plains Commerce*. *See Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167, 174–75 (5th Cir. 2014), *aff'd by an equally divided court*, 579 U.S. 545 (2016) (per curiam); *Knighton*, 922 F.3d at 903–04. Only the Seventh Circuit explicitly requires this separate inquiry. *See Jackson v. Payday Fin.*, 764 F.3d 765, 783 (7th Cir. 2014). Our court is in the majority on this split, and we should remain so.

Because the panel's narrow holding applied our tribal jurisdiction jurisprudence, the court appropriately decided not to rehear this case en banc.

## I. No Physical Presence Requirement for Nonmember Conduct on Tribal Land

To determine whether a tribe has jurisdiction over a nonmember, we first determine whether the nonmember's conduct at issue occurred within the boundaries of the reservation. *See Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 938 (9th Cir. 2009). The extensive recitation in the opinion establishes this prong of the analysis. That foundation—relying on *Merrion*—and coupled with *Montana* confirm that a nonmember conducting business with a tribe that is directly connected to tribal lands can be subject to tribal jurisdiction. No part of this test requires the physical presence of a nonmember on a reservation.

The dissent, however, seeks to graft a physical presence requirement onto our tribal jurisdiction precedents, but points to no language in any Supreme Court or circuit court opinion that explicitly equates *conduct* on tribal land with *physical presence* on that land. Dissent at 41–42. He assumes that just because every case that has come before the Supreme Court or the Ninth Circuit thus far has involved some sort of physical presence, that it should be imposed as a necessary predicate for conduct inside a reservation. And his foray into history does not alter the jurisdictional analysis we must undertake. This effort to collapse jurisdiction into a physical requirement ignores the importance of applying the law given to us to the facts before us.

## A.  Precedent, Not History, is Controlling

The dissent starts with historical background because supposedly "historical perspective [can] cast[] substantial doubt upon the existence of [tribal] jurisdiction."  Dissent at 26 (citation omitted).  Compiling articles and books, laws, treaties, and U.S. Attorney General opinions to argue that "nothing in the history of Indian relations supports tribal jurisdiction over nonmembers acting outside of Indian lands," *id.*, is a misleading syllogism.

Despite the dissent's love of early American history, history is not the solution to the jurisdictional puzzle.  In the early nineteenth century and prior, business with tribes—in the form of trade—as a practical matter required physical interactions, thus giving rise to the robust legal framework regulating, and federal-tribal disputes over, the permitting of outside traders within tribal territories.  *See, e.g.*, Act of July 22, 1790, ch. 33, 1 Stat. 137, 137–38; Act of March 30, 1802, ch. 13, 2 Stat. 139, 142–43; Lisa Ford, *Settler Sovereignty: Jurisdiction and Indigenous People in America and Australia, 1788–1836*, at 154–55 (2010).  Non-Indian traders would have to come onto tribal territories to sell goods.  But the circumstances of tribes have drastically changed.  Trading no longer requires a physical presence and so, unsurprisingly, the Supreme Court has never imposed such a requirement.  Today, tribes run a variety of businesses, ranging from casinos to seafood companies.  *See, e.g.*, *Lexington*, 94 F.4th at 876.  And now nonmembers regularly conduct business with tribes over the phone, the Internet, and email.  *See, e.g.*, *id.* at 881–82; *Jackson*, 764 F.3d at 768–69.

Tribes' capacity to adjudicate disputes involving nonmembers and businesses has also changed dramatically.  Although tribes may not have had "formal adjudicatory

bodies to handle civil disputes" long ago, Dissent at 27, many tribes now have organized trial and appellate court systems, law-trained judges, and extensive codes. For example, the Suquamish Tribe, a defendant here, has a trial court and a court of appeals, and it requires its judges to have graduated from an accredited law school and be licensed to practice law. Suquamish Tribal Code §§ 3.1, 3.3. The Tribe also has reasonable measures to protect judicial independence, including fixed terms of office for judges and a requirement for notice and a hearing before removal. *Id.* § 3.3. Whatever historical constraints may have existed to limit tribal adjudication no longer exist, nor do they suggest that tribal courts "treat members unfairly." *FMC Corp. v. Shoshone-Bannock Tribes*, 942 F.3d 916, 944 (9th Cir. 2019). The Supreme Court, our court, and our sister circuits have rejected attacks like the dissent's on tribal judiciaries time and time again. *See id.* at 943–44; *see also Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 808 (9th Cir. 2011) (per curiam) (recognizing the longstanding "federal policy of deference to tribal courts," which "are competent law-applying bodies" (citations omitted)).

Tribal history is definitely interesting, but it is not informative here. The dissent's dalliance into history also does not conform with controlling Supreme Court and circuit precedent on what qualifies as nonmember conduct inside the reservation. The pathmarking tribal jurisdiction case, *Montana v. United States*—decided almost 130 years after the history recounted in the dissent—provides for a broad understanding of consensual relationships between nonmembers and tribes, not just for business transactions involving physical interactions. 450 U.S. at 565 ("A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual

relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."). Two years later, in *Merrion v. Jicarilla Apache Tribe*, the Supreme Court built on this understanding by explaining that the "territorial component to tribal power" is triggered when a "nonmember enters tribal lands **or** *conducts business with the tribe*." 455 U.S. at 142 (1982) (emphasis added).

Our own court's precedent further belies the dissent's emphasis on physical presence. As an en banc panel of our court explained, we determine whether nonmember conduct has occurred on tribal land by considering "whether the cause of action brought by the[ ] parties *bears some direct connection to tribal lands*." *Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1135 (9th Cir. 2006) (en banc) (emphasis added). Taking our cues from this test in *Smith* and *Knighton*, we concluded that Lexington's conduct took place on tribal land because "[t]ribal land literally and figuratively underlies the contract at issue here." *Lexington*, 94 F.4th at 881. The dissent chooses to ignore that tribal jurisdiction may be proper under the "direct connection" test if a cause of action is sufficiently tied to tribal lands.

## B. Other Circuits' Cases

The dissent's invocation of tribal jurisdiction cases from other circuits fares no better. In *Stifel*, the Seventh Circuit rejected tribal jurisdiction where the tribe had issued bonds to off-reservation companies for an *off-reservation investment* project, albeit secured by the revenues and assets of a casino on tribal lands. *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 189, 207–08 (7th Cir. 2015). Significantly, the bonds' purpose had no connection to the reservation. *Id.* at

189. Nor did the tribal court action "seek to regulate any of [the nonmember company's] activities on the reservation," namely meetings regarding the sale of the bonds. *Id.* at 207– 08. The *Stifel* analysis is not persuasive here.

The Tenth Circuit's decision in *MacArthur* is also inapposite. In *MacArthur*, the court held that even though a consensual relationship existed between a clinic situated on non-Indian fee land within the Navajo Nation Reservation and tribal member employees, the tribe did not have jurisdiction under *Montana* because the entity that administered the clinic was "a political subdivision of the State of Utah." *MacArthur v. San Juan County*, 497 F.3d 1057, 1072 (10th Cir. 2007). Enough said as the focus on an employment relationship is far afield from this case.

Finally, the dissent's reliance on other circuit's tribal jurisdiction cases involving the Internet is misplaced. In *Jackson v. Payday Financial, LLC*, the Seventh Circuit rejected tribal jurisdiction over nonmembers' suit against a tribal member's loan companies because the nonmembers' activities, which were entirely conducted over the Internet, did "not implicate the sovereignty of the tribe over its land." 764 F.3d at 782. In contrast, this case directly implicates sovereignty over the land. Likewise, in *Hornell Brewing*, the Eighth Circuit similarly rejected tribal court jurisdiction over nonmember breweries for their use of the name "Crazy Horse" for their malt liquor. *Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.*, 133 F.3d 1087, 1093–94 (8th Cir. 1998). The breweries manufactured, sold, and distributed the malt liquor only outside the reservation and had no connection to the reservation other than advertising on the Internet. *Id.* at 1093. The common thread in both cases is that neither involved tribal land.

At base, Judge Bumatay elevates form over substance. We doubt that Judge Bumatay would have objected to the panel's holding had a Lexington insurance representative met a tribal official one foot within the bounds of the Reservation or if a Lexington representative had inspected the Tribal properties in person or denied coverage in a single meeting on the Reservation. We should not reduce our test for nonmember conduct—a test that "centers on the land held by the tribe" and looks to protecting the "tribe's sovereign interests"—to whether a nonmember has physically tiptoed onto a parcel of land within the boundaries of a reservation. *Plains Commerce*, 554 U.S. at 327, 332. Ultimately, the dissent glosses over the fact that no court has addressed a situation like *Lexington*. In sum, no physical presence requirement exists, and rehearing en banc to create one out of whole cloth was properly rejected.

## II. *Plains Commerce* Imposed No Additional Jurisdictional Requirement

The dissent argues that the Supreme Court now imposes a new limitation as a result of *Plains Commerce*, in which the Court stated:

> Consequently, [tribal] laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations.

554 U.S. at 337. Rather than imposing an additional requirement, the Court was merely clarifying that a

nonmember's consent to tribal law is not enough for tribal jurisdiction and cannot circumvent the limitations on tribal authority. Tribal law could only be enforced against a nonmember if that person consented *and* the tribe "had the authority to do so under the power to exclude—the 'authority to set conditions on entry'—or the *Montana* exceptions—the authority to 'preserve tribal self-government[ ] or internal relations.'" *Lexington*, 94 F.4th at 886 (quoting *Plains Commerce*, 554 U.S. at 337). No new requirement was imposed.

In *Knighton*, we interpreted the "must stem" language as an affirmation of the "varied sources of tribal regulatory power over nonmember conduct on the reservation," including a tribe's power to exclude and its inherent sovereign authority. 922 F.3d at 903 (citing *Plains Commerce*, 554 U.S. at 337). *Knighton* did not recognize this phrase as a supplemental requirement to the *Montana* analysis but as an explanation that the "*Montana* exceptions are 'rooted' in the tribes' inherent power to regulate nonmember behavior that implicates these *sovereign interests*." 922 F.3d at 904 (emphasis added) (citation omitted). The panel therefore followed the controlling law of the circuit—which properly construed *Plains Commerce*—in rejecting this separate inquiry requirement.

Only one circuit—the Seventh Circuit—has explicitly held in a tribal jurisdiction case that *Plains Commerce* requires a separate inquiry into a tribe's authority for a regulation. *See Jackson*, 764 F.3d at 783. Notably, the other cases cited by the dissent—from the Sixth and Eighth Circuits—do not relate to tribal jurisdiction. *See NLRB v. Little River Band of Ottawa Indians Tribal Government*, 788 F.3d 537, 544, 546 (6th Cir. 2015) (addressing whether the National Labor Relations Board could apply the National

Labor Relations Act to the operations of a tribal casino); *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1134–38 (8th Cir. 2019) (discussing federal preemption of oil and gas royalty suits brought by tribal members). And the Fifth Circuit has sided with the Ninth in definitively rejecting this separate inquiry requirement. *Dolgencorp,* 746 F.3d at 175.

Tribal jurisdiction stems from the principle that "Indian tribes have long been recognized as sovereign entities, 'possessing attributes of sovereignty over both their members and their territory.'" *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 591 (9th Cir. 1983) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)). And that tribal sovereignty over territory is implicated when nonmember behavior regarding that territory "sufficiently affect[s] the tribe as to justify tribal oversight." *Plains Commerce*, 554 U.S. at 335. The Lexington scenario easily fits within this construct as "the relevant insurance policy covers the properties and operations of a tribal government and businesses that extensively 'involved the use of tribal land' and the businesses 'constituted a significant economic interest for the tribe.'" *Lexington*, 94 F.4th at 887 (quoting *Water Wheel*, 642 F.3d at 817).

The panel in *Lexington* did nothing but apply our precedent straight up and surely did not open the floodgates for unnecessary tribal court litigation. The court's decision to deny rehearing en banc was grounded in precedent and common sense.

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA, R. NELSON, VANDYKE, Circuit Judges, and COLLINS, Circuit Judge, as to Part III.B only, dissenting from the denial of rehearing en banc:

This case should be a run-of-the-mill insurance dispute. Those familiar with insurance cases will know the basic facts of the case: plaintiffs buy insurance policy from insurance company; plaintiffs have an event causing loss; plaintiffs believe the loss should be covered by the policy; insurance company disagrees that the policy applies; and, as a result, plaintiffs sue insurance company. Federal courts see these types of cases repeatedly under our diversity jurisdiction. In those cases, we simply apply state law to determine who wins. Indeed, the Ninth Circuit has seen this precise dispute many times—do property insurance policies cover damages caused by COVID-19?

But this case features a minor twist. Plaintiffs are an Indian tribe and its businesses. And rather than applying state law and invoking diversity jurisdiction, the tribe wants to hale the insurance company into its own tribal court to apply its own law. It asserts jurisdiction even though the insurance company is not a member of the tribe and isn't located on the reservation. In fact, none of its employees have ever entered the reservation. The insurance company never communicated with the tribe or a tribal member before this dispute—instead, two nonmember, off-reservation intermediaries secured the policies for the tribe. As a panel of our court concluded, "all relevant conduct occurred off the [r]eservation" and no insurance company employee was "ever physically present" on the reservation. *Lexington Ins. v. Smith*, 94 F.4th 870, 881 (9th Cir. 2024). Even with these facts, the panel granted tribal court jurisdiction over the

nonmember insurance company. This decision defies both the Constitution and Supreme Court precedent.

\* \* \*

Indian tribes enjoy a unique status under our Constitution. "At one time," before the founding of this Nation, Indian tribes may have had "virtually unlimited power" over their members and nonmembers in their territories. *Nat'l Farmers Union Ins. v. Crow Tribe of Indians*, 471 U.S. 845, 851 (1985). But today, because of their quasi-sovereign status under the United States, tribal relationships with nonmembers have significantly changed. Now, Indian tribes retain only the sovereign powers not divested by Congress and not inconsistent with their dependence on the federal government. So federal law—not Indian sovereignty—defines the "outer boundaries of an Indian tribe's power over non-Indians." *Id.* And under the Constitution, federal courts must protect the "liberty interests of nonmembers." *Plains Com. Bank v. Long Fam. Land & Cattle, Co.*, 554 U.S. 316, 330 (2008). Thus, the Supreme Court has been clear on the default rule when it comes to non-Indians: "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana v. United States*, 450 U.S. 544, 565 (1981).

So while tribes retain residual sovereign powers, tribal courts have no plenary civil jurisdiction over nonmembers. Of course, as with every rule, there are exceptions, but they are "limited ones." *Plains Com.*, 554 U.S. at 330 (simplified). First, tribal courts may assert civil jurisdiction over a nonmember if the nonmember enters a "consensual relationship[] with the tribe or its members," *Montana*, 450 U.S. at 565 (simplified), and the dispute involves "non-

Indian activities on the reservation." *Plains Com.*, 554 U.S. at 332. Second, tribal courts may have civil jurisdiction over nonmember conduct on a reservation that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. Under either of these two *Montana* exceptions, the dispute must center on "nonmember *conduct* inside the reservation." *Plains Com.*, 554 U.S. at 332; *see also id.* at 333 ("Our cases since *Montana* have followed the same pattern, permitting regulation of certain forms of nonmember conduct on tribal land."). So, a tribe's jurisdictional limits can be no greater than its geographic limits. No on-reservation activity, no tribal court jurisdiction. And we may not interpret these exceptions to either "swallow the rule" or "severely shrink it." *Id.* at 330 (simplified).

Even with on-reservation conduct, tribal court civil authority is not assured. That's because the Supreme Court has put up another hurdle—tribal court jurisdiction may only exist for some substantive *types* of claims brought against non-Indians. *Id.* at 337. Even if "the nonmember has consented" to tribal laws and regulations, tribal courts' adjudicative power still "must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Id.* (citing *Montana*, 450 U.S. at 564). And tribes may only regulate and adjudicate nonmember activities "flow[ing] directly from these limited sovereign interests." *Id.* at 335. Thus, in *Plains Commerce*, although the suit involved the sale of non-Indian fee land on a tribal reservation, the Court said that "whatever 'consensual relationship' may have been established through the [nonmember's] dealing with the [tribal members]," tribal courts had no authority to regulate

"fee land sales" by nonmembers. *Id.* at 336, 338–40. That's because the regulation could not be justified by the tribes' interest in excluding persons from tribal land or in protecting internal relations and self-government. *Id*. at 338–40. So geography isn't enough—suits over nonmembers must implicate both tribal geography and tribal sovereignty. Only after meeting both *Montana*'s on-reservation requirement and *Plains Commerce*'s inherent-sovereign-authority requirement can nonmembers be haled into tribal court. In other words, even if a nonmember satisfies the geographic nexus to tribal land, certain substantive areas of regulation of nonmembers are still off limits for tribal courts.

If these prerequisites seem hard to meet, that's because they are. In the more than forty years after *Montana*, the Supreme Court has "never held that a tribal court had jurisdiction over a nonmember defendant." *See Nevada v. Hicks*, 533 U.S. 353, 358 n.2 (2001). These are fundamental limits on tribal court jurisdiction. And they cannot be ignored.

\* \* \*

Despite the Court's clear mandate, a Ninth Circuit panel blessed tribal court jurisdiction over an insurance claim involving a nonmember even when "all relevant conduct occurred off the reservation" and the nonmember was "[n]ever physically present" on the reservation. *Lexington Ins.*, 94 F.4th at 881. Instead, the panel concluded that "a nonmember's business with a tribe may very well trigger tribal jurisdiction—even when the business transaction does not require the nonmember to be physically present on those lands." *Id.* This is a startling expansion of tribal court jurisdiction in two ways.

First, the panel decision gutted any geographic limits of tribal court jurisdiction.  The panel focused instead on the facts that "the nonmember consensually joined an insurance pool explicitly marketed to tribal entities; the nonmember then entered into an insurance contract with a tribe; the contract exclusively covered property located on tribal lands; and the tribe's cause of action against the nonmember arose directly out of the contract." *Id.* at 886.  But no conduct or activity actually occurred on the reservation.  The panel shrugged off that deficiency.  It simply ripped the requirement of actual physical presence and activity from the meaning of "nonmember conduct inside the reservation." *Plains Com.*, 554 U.S. at 332.  It then looked to the *object* of the contract, rather than any actual *on-reservation actions or conduct*, and said that was good enough for tribal court jurisdiction.  As far as I can tell, we are the first and only circuit court to extend tribal court jurisdiction over a nonmember without requiring the nonmember's actual physical activity on tribal lands.  So the application is novel, unwarranted, and contrary to precedent.

Second, beyond jettisoning the geographic limits, the panel also significantly expanded the substantive scope of tribal regulatory authority over nonmembers.  The panel permitted an insurance claim to proceed in tribal court even though insurance regulation, like regulation of fee land sales, has little connection to a tribe's inherent sovereign authority.  Rather than determining whether insurance regulation "stem[s] from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations," *Plains Com.*, 554 U.S. at 337, the panel dispensed with this limitation by collapsing the *Plains Commerce* requirement into the *Montana* exceptions analysis.  The panel concluded, "[i]f the conduct at issue

satisfies one of the *Montana* exceptions, it *necessarily* follows that the conduct implicates the tribe's authority in one of the areas described in *Plains Commerce*." *Lexington Ins.*, 94 F.4th at 886 (emphasis added). Thus, if there is a sufficient consensual relationship between the nonmember and tribe, in the panel's view, that's the end of the inquiry. The tribal courts *automatically* have jurisdiction—no matter the subject matter. So tribes now have authority over insurance regulation despite "states' near-exclusive regulation of insurance and the Tribe's lack of insurance regulations." *Id.* at 885.

This evisceration of *Plains Commerce* puts us on the wrong side of a circuit split. Three circuits support an independent inquiry into whether the subject matter of tribal regulation involves the tribe's inherent sovereign authority. *See Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1138 (8th Cir. 2019); *NLRB. v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 546 (6th Cir. 2015) (in dicta); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 783 (7th Cir. 2014). Only one, the Fifth, disagrees. *See Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167, 175 (5th Cir. 2014), *aff'd by an equally divided court*, 579 U.S. 545, 546 (2016) (per curiam). We should have reheard this case to put ourselves on the correct side of that split.

The effects of the panel decision are significant. Granting tribal court jurisdiction over nonmembers is no little matter. Tribal courts are unlike state and federal courts. First, there's no protection against political interference or the guarantee of the separation of powers. Instead, tribal courts "are often subordinate to the political branches of tribal governments." *Duro v. Reina*, 495 U.S. 676, 693 (1990) (simplified). Second, tribal courts don't rely on well-defined statutory or common law. Rather, tribal law is

"frequently unwritten, [and] based instead 'on the values, mores, and norms of a tribe and expressed in its customs, traditions, and practices.'" *Hicks*, 533 U.S. at 384 (Souter, J., concurring) (quoting Melton, *Indigenous Justice Systems and Tribal Society*, 79 Judicature 126, 131 (1995)). Tribal law then is "unusually difficult for an outsider to sort out." *Id*. at 385. And finally, because the tribes lie "outside the basic structure of the Constitution," the Bill of Rights, including the rights of due process and equal protection, doesn't apply in tribal courts. *See Plains Com.*, 554 U.S. at 337 (simplified). So, without any constitutional backstop, tribal suits are almost exclusively tried before tribe-member judges and all-tribe-member juries. *See, e.g.*, *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 194 n.4 (1978). All this is foreign to those accustomed to the protections of state and federal courts and may well deprive nonmembers of their constitutional rights.

But now *every* off-reservation nonmember person or company is at risk of being haled into tribal court if they enter a business relationship with a tribe or a tribal member related to tribal land. Imagine the implications of the panel's view: A certified public accountant in Pittsburgh who made calculations involving "losses and expenses incurred by . . . businesses and properties on [tribal] lands," *Lexington Ins.*, 94 F.4th at 881, is at risk of a tribal negligence claim. A foreign software designer who contracts with a tribe to update a widely available slot machine may qualify for a tribal products liability suit because the machines are used on tribal lands and constitute a "significant economic interest for the tribe," *id.* at 887 (simplified). And a New York-based lawyer advising on compliance, "involv[ing] tribally owned buildings and businesses located on tribal trust land," *id.* at 880, could face a tribal malpractice claim when things go

south. Never mind that no one ever made it within 1,000 miles of the tribe's land. *See id.* at 882 ("Lexington's business relationship with the Tribe satisfie[d] the requirements for conduct occurring on tribal land, thereby occurring within the boundaries of the reservation. . . .").

So we should have corrected two errors here. First, we should have corrected the extension of tribal court jurisdiction to nonmembers who enter a contract with a tribe involving tribal land—even if they never set foot on tribal land and even though "all relevant conduct occurred off the [r]eservation." *See id.* at 881. Second, we should have corrected the removal of *all substantive limits* on what nonmember activity tribes may regulate. Letting these errors stand places the Ninth Circuit—yet again—against the weight of precedent and longstanding constitutional principles.

I respectfully dissent from the denial of rehearing en banc.

## I.

### Factual Background

The Suquamish Tribe is a federally recognized tribe with sovereign authority over the Port Madison Reservation in the State of Washington. *Lexington Ins.*, 94 F.4th at 876. The reservation encompasses about 12 square miles. *Oliphant*, 435 U.S. at 192–93. On the reservation, the Suquamish Tribe operates several businesses, including a museum, casino, hotel, and gas stations. *Lexington Ins.*, 94 F.4th at 876. It runs its commercial operations partly through a "tribally chartered economic development entity," known as Port Madison Enterprises. *Id.*

In 2015, the Suquamish Tribe and Port Madison Enterprises (collectively, the "Tribe") purchased insurance policies from Lexington Insurance Company and several other off-reservation insurance companies (collectively, "Lexington") through a nonmember off-reservation insurance broker. *Id.* That broker found the insurance policies through Alliant Specialty Services, Inc., a nonmember off-reservation firm, which operates "Tribal First"—a program that tailors insurance needs for tribes and tribal businesses around the country. *Id.* at 876–77. Tribal First does not provide the insurance itself, but it contracts with insurance companies that provide coverage to tribal governments and businesses. *Id.* Tribal First handles the underwriting, provides quotes, collects premiums, and manages claims and administrative services. *Id.* Under the Tribal First program, the underlying insurance companies do not negotiate directly with the tribal entities. Instead, so long as the tribal applicant meets the Tribal First requirements, the contracted insurance companies will issue a policy. That policy is then forwarded by Tribal First to the insured entity.

This case followed the usual Tribal First process. The nonmember insurance broker secured a contract between the Tribe and Alliant. *Id.* In turn, Lexington contracted with Alliant to issue the insurance policies here. *Id.* Alliant then provided those policies to the Tribe. Lexington never had any contact with the Tribe. As the Tribe admitted, "it did not have direct contact with [Lexington] during the negotiation of the policies." Lexington merely contracted with Alliant, which set forth Lexington's obligations under the Tribal First program. Lexington did not process the Tribe's applications for insurance; collect premiums from the Tribe; prepare or provide quotes, cover notes, policy documentation, or evidence of insurance to the Tribe; or develop or maintain an

underwriting file for the Tribe. Alliant performed these tasks. So Lexington never dealt directly with the Tribe. Lexington did not even know the Tribe's identity until the policies were issued.

The insurance policies between Lexington and the Tribe "covered 'all risks of physical loss or damage' to 'property of every description both real and personal' located on the trust lands, as well as interruptions to business and tax revenues generated within the [r]eservation." *Id.* at 877. And the policies were registered "under the insurance code of the state of Washington."

In March 2020, the Suquamish tribal government and Washington State issued orders restricting business operations and travel because of the COVID-19 pandemic. *Id.* The Tribe then submitted claims for coverage under the insurance policies. *Id.* After receiving reservation-of-rights letters suggesting the policies may not cover COVID-19-related losses, the Tribe sued Lexington for breach of contract in the Tribe's court. *Id.* Lexington moved to dismiss, arguing the tribal court lacked tribal jurisdiction and personal jurisdiction. *Id.* at 878. The Suquamish lower court denied the motion and the tribal court of appeals affirmed. *Id.*

After exhausting appeals in the tribal courts, *see Nat'l Farmers Union Ins.*, 471 U.S. at 857 (requiring exhaustion in tribal court), Lexington sued in federal court for a declaratory judgment that the tribal court lacked jurisdiction, *Lexington Ins.*, 94 F.4th at 878. The district court sided with the Tribe and confirmed the tribal court's jurisdiction over Lexington. Lexington then appealed to our court, and the panel "easily conclude[d] that Lexington's business relationship with the Tribe satisfies the requirements for

conduct occurring on tribal land, thereby occurring within the boundaries of the reservation and triggering the presumption of jurisdiction." *Id.* at 882. It held that the insurance policies between Lexington and the Tribe sufficed to establish a "mutual and consensual" relationship because the "transaction had tribe and tribal lands written all over it." *Id.* at 884. So Lexington was "on notice" that it could be haled into a tribe's courts for actions related to the insurance policies. *Id.*

Lexington then petitioned for rehearing en banc.

## II.

### Historical and Legal Background

Before getting into the multiple ways that the panel decision gets this case wrong, it's worth providing some historical background on tribal court authority over nonmembers. After all, "historical perspective [can] cast[] substantial doubt upon the existence of [tribal] jurisdiction." *See Oliphant*, 435 U.S. at 206. Here, nothing in the history of Indian relations supports tribal jurisdiction over nonmembers acting outside of Indian lands. After surveying this history, I turn to Supreme Court precedent governing this question. As is no surprise, Supreme Court precedent doesn't support extending tribal-court jurisdiction to nonmembers' off-reservation conduct either.

### A.

### History of Tribal Authority over Nonmembers

Early American laws, treaties, and executive branch views all hint at a "commonly shared presumption," *id.* at 206, that tribal courts do not have adjudicative authority over nonmembers acting outside of tribal lands. Much of the

evidence indicates Indian tribes had little to no authority over non-Indians.  When Indian tribes exercised any civil authority over non-Indians, historical evidence suggests it was only when the non-Indian was *physically* present on tribal lands and had joined the tribe or otherwise forfeited the protections of the United States.  While this history may not be dispositive here, it "carries considerable weight."  *Id.* And it strikes sharply against the panel's view of significant tribal authority over nonmembers operating outside of tribal lands.

During the colonial period, Indians did not have formal adjudicatory bodies to handle civil disputes.  "To the Indians, law and justice were personal and were clan matters not generally involving a third party and certainly not involving an impersonal public institution.  The Indians considered such English legal apparatus as courts, juries, and jails meaningless."  Yasuhide Kawashima, *The Indian Tradition in Early American Law*, 17 Am. Indian L. Rev. 99, 99 n.1 (1992).  Thus, some colonies "tried to extend their own law to the Indians."  *Id.* at 99.  For example, the Massachusetts colonists "demanded the extension of the colonial jurisdiction over the Indian territories, except for legal matters arising among the tribal Indians themselves." Yasuhide Kawashima, *Jurisdiction of the Colonial Courts over the Indians in Massachusetts, 1689–1763*, New Eng. Q. 532, 549 (1969).  Massachusetts and Connecticut began asserting expansive jurisdiction over Indian territory, likely fueled by military victories over tribes.  Lisa Ford, *Settler Sovereignty: Jurisdiction and Indigenous People in America and Australia, 1788–1836* 19 (2010).

Even so, colonies did not completely exclude Indians from adjudicating disputes.  For example, some laws permitted Indian tribes to act directly against the property of

those who entered Indian territory. Take a law from the Connecticut colony. It established how property damage to Indian corn fields by colonists would be compensated. An Act for the Well-Ordering of the Indians (1715), *reprinted in Acts and Laws, of His Majesties Colony of Connecticut in New England* 58 (Timothy Green ed., 1715). The law authorized Indians to "impound and secure Cattel, Horses or Swine trespassing upon [their lands]." *Id.* Thus, they could act unilaterally on property that entered the tribe's territory. Other colonial laws required some forms of consultation with Indian tribes. Consider a 1715 North Carolina law establishing that trade disputes between a colonist and an Indian would be "heard, tried, and determined" by colonial leaders "together with the Ruler or Head Man of the Town to which the *Indian* belongs." An Act, for Restraining the Indians from Molesting or Injuring the Inhabitants of This Government, and for Securing to the Indians the Right and Property of Their Own Lands (1715).

Thus, during the colonial period, tribes had a role in adjudicating property and commercial disputes between settlers and Indians, despite lacking formal courts themselves. Still, even at this early stage, the seeds of the current geographic framework for tribal jurisdiction were already planted. Indian tribes were recognized to have authority to seize colonist property physically on their land but the colonies retained authority when regulating trade between the two.

By the Founding, and in the decades that followed, historical evidence supports some tribal civil power over non-Indians—but only for non-Indians residing on tribal land who had joined the tribe or had otherwise withdrawn from the protection of the United States. Early treaties, for instance, recognized Indian jurisdictional authority over

trespassers who chose to remain unlawfully and settle in tribal territory. They would "forfeit the protection of the United States, and the Indians may punish him or not as they please." Treaty With the Cherokee, Art. V, Nov. 28, 1785, 7 Stat. 19; *see also* Treaty With the Chickasaw, Art. IV, Jan. 10, 1786, 7 Stat. 25 (non-Indian settlers forfeit United States protection, allowing the tribe to "punish him or not as they please"); Treaty With the Choctaw, Art. IV, Jan. 3, 1786, 7 Stat. 22 (same); Treaty With the Creeks, Art. VI, Aug. 7, 1790, 7 Stat. 37 (same).

Outside of non-Indians residing on Indian lands who abandoned the protections of the United States, most treaties explicitly recognized the United States' "sole and exclusive right of regulating the trade with the Indians." Treaty With the Cherokee, Art. IX, 7 Stat. 20 ("For the benefit and comfort of the Indians . . . the United States in Congress . . . . shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they think proper"); Treaty With the Chickasaw, Art. VIII, 7 Stat. 25 (same); Treaty With the Choctaw, Art. VIII, 7 Stat. 23 (same); Treaty With the Cherokee, Art. VI, July 2, 1791, 7 Stat. 40 (Cherokee agree "that the United States shall have the sole and exclusive right of regulating their trade"). Under other treaties, tribes agreed they would ensure that Indians and settlers alike would abide by federal commercial laws. *See* Treaty With the Wyandot, Etc., Art. VII, Jan. 9, 1789, 7 Stat. 30 (requiring non-Indian traders to acquire licenses from the territorial governor or an Indian agent, and requiring Indians to hand over traders without permits to be punished under United States law); Treaty With the Wyandot, Etc., Art. VIII, Aug. 3, 1795, 7 Stat. 52 (similar); Treaty With the Sauk and Foxes, Art. 8, Nov. 3, 1804, 7 Stat. 86 ("the said tribes do promise and agree that

they will not suffer any trader to reside amongst them without [a federal] license"); Treaty With the Creeks, Art. 3d, Aug. 9, 1814, 7 Stat. 121 (requiring the Creek to "not admit among them, any agent or trader" not licensed by "the President or authorized agent of the United States"); *Articles of Agreement and Capitulation Between the United States and the Sauk and Fox*, *in* 2 *The Black Hawk War, 1831–1832* 85, 86 (William K. Alderfer ed., 1973) (similar). Even when tribes had some say, they generally could provide licenses to traders who "reside in the [tribal] Nation and are answerable to the laws of the [tribal] Nation." *See, e.g.*, Treaty With the Choctaw, Art. X, Sept. 27, 1830, 7 Stat. 335. In other words, tribal authority was limited to those who had voluntarily submitted to tribal authority through residence.

Some treaties even limited Indian tribes' inherent sovereign authority to exclude. When the Suquamish signed the Treaty of Point Elliott, the United States permitted "full jurisdiction" by the Choctaw and Chickasaw over their own members but forbid jurisdiction over "all persons, with their property, who are not by birth, adoption, or otherwise citizens or members" of the tribes. Treaty With the Choctaw and Chickasaw, Art. 7, June 22, 1855, 11 Stat. 613. As to trespassers, the United States permitted removal, but not by the tribe. Instead, only "by the United States agent, assisted if necessary by the military." *Id.* These same terms appeared in the treaty with the Creeks and Seminoles. Treaty with the Creeks, Etc., Art. 15, Aug. 7, 1856, 11 Stat. 704. Those treaties also provided that, in the event of a wrongful act by a U.S. citizen, it was the federal government that would provide recompense and "full indemnity . . . to the party or parties injured." Treaty With the Choctaw and Chickasaw, Art. 14, 11 Stat. 615; Treaty With the Creeks, Etc., Art. 18, 11 Stat. 705.

Early federal laws regulating commerce often established federal Indian agents who adjudicated disputes between Indians and non-Indian traders. Those acts regulated the rules of trade between tribal territories and the United States. *See, e.g.*, Act of July 22, 1790, ch. 33, 1 Stat. 137, 137–38; Act of March 30, 1802, ch. 13, 2 Stat. 139, 141. They also established federal Indian agents to "reside among the Indians, as [the President] shall think proper." Act of March 1, 1793, ch. 19, 1 Stat. 329, 331. While these laws did not speak explicitly to "settler torts and breaches of contract" within tribal territory, some federal Indian agents stepped into the void. *See* Ford, *supra*, at 60. These agents oversaw the resolution of criminal and civil matters between Indians and nonmembers. For example, Return J. Meigs, a federal agent to the Cherokees, "set up commissions in Cherokee Country to adjudicate civil disputes between settlers and Indians." *Id.* at 39. Meigs "staffed these commissions with settlers and ran them remarkably like common law courts." *Id.* Thus, it was federal agents who "investigate[d] claims arising between settlers and indigenous people about the theft of property or broken promises." *Id.* at 65. Instead of tribal authorities deciding civil disputes, federal agents did so by applying non-Indian law and equity. *See id.* at 66–67. In Meigs's view, "the Cherokees were a dependent people, and as such had no innate right to maintain their tribal integrity or independent governance." *Id.* at 39.

That said, federal Indian agents were not unanimous in the view of their authority. Benjamin Hawkins, who was federal Indian agent for the Creek, believed he was acting under designated tribal authority while resolving disputes "untill [*sic*] I am otherwise directed by our government or that Congress can legislate on the subject." 2 *Letters,*

*Journals and Writings of Benjamin Hawkins*, *1802–1816*
508–09 (C.L. Grant ed., 1980). And he oversaw tribal
adjudications of settlers—although apparently those settlers
had voluntarily submitted themselves to tribal authority in
line with relevant treaties and lost the protection of the
United States. *See* Ford, *supra*, at 60–61. These settlers then
occupied "a whole and growing category of [people] who
might fall outside federal law" and who thus fell within the
authority of tribes. *See id.* at 60.

Early U.S. Attorney General opinions also limited tribal
authority over nonmembers. In 1834, Attorney General
Benjamin Butler sweepingly concluded that Choctaw courts
had *no jurisdiction* whatsoever over American citizens. 2
U.S. Op. Att'y Gen. 693 (1834). In Butler's view, while the
United States had guaranteed internal governance of Indian
tribal members, U.S. citizens were independently subject to
the authority of the United States and immune from tribal
authority. *Id.* at 694. They "were not amenable to the laws
or courts of the Choctaw nation; and that, for offences
against the person or property of each other, or of the
Choctaws, they could only be tried and punished under the
laws of the United States." *Id.* at 695. Butler appeared
unmoved by any appeal to inherent tribal authority over
nonmembers—even those on tribal lands who became tribe
members. *See id.* at 693–94 (recognizing "the limitation of
the Choctaw jurisdiction to the government of the Choctaw
Indians"). But Butler's view conflicted with the "long-held
convention . . . that long-term residents of Indian Country
were subject to indigenous jurisdiction." Ford, *supra*, at 61.

In 1855, Attorney General Caleb Cushing cabined
Butler's opinion to criminal matters and recognized Indian
civil jurisdiction over non-Indian American citizens who
voluntarily joined the tribe and resided on tribal lands. 7 Op.

Att'y Gen. 174, 185 (1855). Cushing opined that Congress had the authority to give the federal government jurisdiction in Indian country, which it had done for criminal cases, but Congress had "ommitt[ed] to take jurisdiction in civil matters." *Id.* at 180. Because the United States "did not reserve by treaty the civil jurisdiction" nor "assume[] it by act of Congress," *id.* at 184, the Choctaw retained civil jurisdiction over its members, including U.S. citizens who "of their own free will and accord [chose] to become members of the [Choctaw] nation," *id.* at 185. As Cushing wrote, "jurisdiction is left to the Choctaws themselves of civil controversies arising *strictly within* the Choctaw nation." *Id.* (emphasis added).

\* \* \*

At a minimum, this perspective shows that the panel's view of tribal court jurisdiction untethered from physical presence and activity on tribal lands is a historical anomaly. If that's not enough to impeach the panel's position, Supreme Court precedent should take care of the rest.

## B.

### Supreme Court Precedent

Indian tribes "were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as states, not as nations, not as possessed of the full attributes of sovereignty." *United States v. Kagama*, 118 U.S. 375, 381 (1886). "Through their original incorporation into the United States as well as through specific treaties and statutes, the Indian tribes have lost many of the attributes of sovereignty." *Montana*, 450 U.S. at 563. Today, "the inherent sovereignty of Indian tribes [i]s limited to 'their members and their territory.'"

*Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 650 (2001) (quoting *Montana*, 450 U.S. at 564).  Given "the powers of self-government," tribes retain broad authority to govern internal relations.  *Montana*, 450 U.S. at 564.  But this power "involve[s] *only the relations among members of a tribe*." *Id.*

Regulation of nonmembers is a different story.  "[T]ribes do not, as a general matter, possess authority over non-Indians who come within their borders."  *Plains Com.*, 554 U.S. at 328.  That's because "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Atkinson Trading*, 532 U.S. at 651 (simplified).  After all, "the tribes have, by virtue of their incorporation into the American republic, lost the right of governing persons within their limits except themselves."  *Plains Com.*, 554 U.S. at 328 (simplified).

In *Montana*, the "pathmarking case concerning tribal civil authority over nonmembers," the Court delineated "two exceptions" to this default rule.  *Strate v. A-1 Contractors*, 520 U.S. 438, 445–46 (1997).  The first exception permits some tribal authority over "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  *Montana*, 450 U.S. at 565 (simplified).  Still, the "regulation imposed by the Indian tribe [must] have a nexus to the consensual relationship itself."  *Atkinson Trading*, 532 U.S. at 656.  The second *Montana* exception allows regulation of "the conduct of non-Indians . . . within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566.

Even with these exceptions, the Court has further limited the subject matter of tribal jurisdiction. Both exceptions recognize that tribes may regulate only nonmember conduct "that implicates the tribe's sovereign interests." *Plains Com.*, 554 U.S. at 332. Thus, when a *Montana* exception is met, "[e]ven then," the tribal court may only have civil jurisdiction when the regulation at issue "stem[s] from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Id*. at 336. In *Plains Commerce*, the Court held that a tribal court lacked jurisdiction to adjudicate a tribal discrimination claim related to a non-Indian bank's sale of fee land because "regulating the sale of non-Indian fee land" is unrelated to the sovereign interests of protecting tribal self-government or controlling internal relations. *Id*. at 335–36. This was the rule "whatever consensual relationship" the non-Indian bank established with tribal members. *Id.* at 338 (simplified).

Even under *Montana*'s consensual-relationship exception, a relationship alone is insufficient. Instead, *Montana* permits only the "regulation of nonmember conduct inside the reservation." *Id.* at 332 (emphasis omitted). So *Montana*'s first exception permits "regulation of non-Indian activities *on the reservation* that had a discernible effect on the tribe or its members." *Id.* (emphasis added). Indeed, *Montana* and its progeny "have always concerned nonmember conduct on the land." *Id.* at 334. As the Court said, they have all "followed [a] pattern, permitting regulation of certain forms of nonmember conduct on tribal land." *Id.* at 333. And this makes sense—after all, sovereignty "centers on the land held by the tribe and on the tribal members within the reservation." *Id.* at 327. So the consensual-relationship

exception requires a relationship *plus* nonmember conduct on the reservation.  Simply put, the precedent says, no on-reservation conduct, no jurisdiction.

Start with decisions before *Montana*.  In *Washington v. Confederated Tribes of Colville Indian Reservation*, various Indian tribes imposed taxes for on-reservation sales of cigarettes to nonmembers.  447 U.S. 134, 141–45 (1980).  The Court upheld the tribes' power to do so, explaining that they have the inherent "authority to tax the activities or property of non-Indians taking place or situated on Indian lands."  *Id.* at 153.  That authority includes the power "to tax non-Indians *entering the reservation* to engage in economic activity."  *Id.* (emphasis added).  This on-reservation requirement was articulated long before the 1980s.  *See, e.g.*, *Morris v. Hitchcock*, 194 U.S. 384, 393 (1904) (upholding tribal authority to tax nonmembers' cattle and horses grazing on Indian territory because refusal to pay the tax would allow the animals "to be wrongfully within the territory"); *Williams v. Lee*, 358 U.S. 217, 223 (1959) (permitting tribal authority over nonpayment action because the nonmember "was on the [r]eservation and the transaction with an Indian took place there").

Next comes *Montana*.  In that case, the Court tackled whether a tribe could regulate hunting and fishing by nonmembers on non-Indian reservation land.  *Montana*, 450 U.S. at 547.  The Court concluded that the default rule, no jurisdiction, applied.  *Id.* at 566.  For the consensual-relationship exception, the Court determined, while the nonmembers entered the reservation to fish and hunt, thus acting on the land, they "d[id] not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction."  *Id.*  The Court thus stressed both

parts of the first exception— (1) a relationship and (2) an action on the land.  Neither is sufficient alone.

A year later, the Court approved a tribe's power to levy a tax on natural resources removed by nonmembers from on-reservation tribal land.  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 133, 136 (1982).  Without citing *Montana*'s first exception by name, the Court observed that tribes have "authority to tax non-Indians who do business on the reservation." *Id.* at 136–37.  In explaining the origin of this taxing power, the Court observed that the power comes from "the nonmember['s] enjoy[ment of] the privilege of trade or other activity on the reservation." *Id*. at 141–42.  So there is of course a "territorial component to tribal power: a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe." *Id.* at 142.  In *Merrion*, the nonmembers did both—they entered a relationship with the tribe and physically removed natural resources from the reservation. *See id.* at 133–38.  Thus, the tax "derive[d] from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction[,]. . . [such as by] requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction." *Id.* at 137.

Now, fast forward to cases applying *Montana*'s "consensual relationship" exception by name.  In *Strate*, a car driven by an employee of a nonmember landscaping company collided with another nonmember vehicle within the bounds of a reservation, but on "alienated, non-Indian land."  520 U.S. at 442–43, 454.  While the landscaping company "was engaged in subcontract work on the . . . [r]eservation, and therefore had a consensual relationship," the on-reservation car accident between nonmembers, on non-Indian land, was "distinctly non-tribal in nature." *Id.*

at 457 (simplified).    That is, even with a consensual relationship, the nonmember's on-reservation conduct was unrelated to that relationship.    *Id.*    Without the hook of related on-reservation nonmember conduct, the tribal relationship was not "of the qualifying kind" for jurisdiction. *Id.*

*Atkinson Trading* followed a similar course.    There, tribes sought to tax nonmember activity on non-Indian fee land—a hotel occupancy tax on any room within the reservation.    *Atkinson Trading*, 532 U.S. at 647–48. Nonmember guests paid the tax to the hotels who remitted it to the tribe.    *Id.*    So nonmember activity occurred on the reservation.    And it related to the tribe's regulation.    But the tribe failed to establish the required consensual relationship. Tribes could not establish a constructive relationship with nonmember guests and businesses through "actual or potential receipt of tribal police, fire, and medical services." *Id.* at 655.    And even though the hotel acquired a permit to become an "Indian trader"—an actual consensual relationship—the permit was unrelated to the relevant nonmember on-reservation conduct: provision of rooms to nonmember guests.    *Id.* at 656–57.    Finally, the Court rejected the tribes' argument that *Merrion* allowed for tribal authority beyond the limits of *Montana*.    *Id.* at 653. "*Merrion* involved a tax that only applied to activity *occurring on the reservation*, and its holding is therefore easily reconcilable with the *Montana–Strate* line of authority, which we deem to be controlling."    *Id.* (emphasis added).

*Hicks*, decided the same term as *Atkinson Trading*, involved a slight twist on the standard tribal authority framework.    There, the Court was asked whether a "tribal court may assert jurisdiction over civil claims against state

officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." *Hicks*, 533 U.S. at 355. The Court explained that "[t]ribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them." *Id.* at 361. Applying that rule, the Court concluded the tribe lacked the inherent power to regulate the state officials. "[R]egulat[ing] state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to the right to make laws and be ruled by them." *Id.* at 364 (simplified).

The most recent case on the consensual-relationship exception, *Plains Commerce*, perhaps puts the finest point on the importance of on-reservation nonmember conduct. There, a tribe sought to regulate the "sale of a 2,230-acre fee parcel [located on the reservation] that the [nonmember b]ank had acquired from the estate of a non-Indian." *Plains Com.*, 554 U.S. at 331. The bank had "general business dealings" with tribal members that could have established a consensual relationship for regulation of some activities. *Id.* at 338. But the bank's sale of the non-Indian fee land was not "nonmember conduct on the land" at all. *Id.* at 334. "The logic of *Montana* is that certain activities on non-Indian fee land (say, a business enterprise employing tribal members) or certain uses (say, commercial development) may intrude on the internal relations of the tribe or threaten tribal self-rule." *Id.* at 334–35. But "conduct taking place on the land and the sale of the land are two very different things." *Id.* at 340. The former involves "regulating nonmember *activity* on the land." *Id.* at 336. But "in no case" had the Court "found that *Montana* authorized a tribe

to regulate the sale of [non-Indian fee] land." *Id.* at 334. "Rather, [the Court's] *Montana* cases have always concerned nonmember conduct on the land." *Id.* And while the land sale *affected* the land, that fact was immaterial without on-reservation nonmember conduct. *Id.* at 336.

Thus, the through-line for all these cases is physical, on-reservation conduct by the nonmember. Without it, no tribal jurisdiction exists.

### III.

### No Tribal Jurisdiction over Lexington

With this framework in mind, I turn to this case.

First, the panel violated *Montana* and its progeny by gutting the on-reservation conduct requirement. Because Lexington never acted on the Tribe's land, a straightforward application of *Montana* means no tribal jurisdiction. Second, besides the geographical problems, there's also subject-matter problems. Simply, the regulation of insurance, which is traditionally a state matter, doesn't implicate the Tribe's sovereign interests. Without regulatory authority over insurance, the Tribe's courts have no adjudicative authority over the claims against Lexington.

### A.

### *Montana*'s Consensual-Relationship Exception Does Not Apply

Looking at the *Montana* consensual-relationship exception under these circumstances, the Tribe lacks jurisdiction over Lexington. As all the Court's cases make clear, the exception requires both a relevant relationship *and* relevant "nonmember conduct inside the reservation." *Id.* at 332 (emphasis omitted). Even assuming the insurance

policies show a consensual relationship between Lexington and the Tribe, the Tribe can't establish that Lexington had the requisite on-reservation conduct.

**1.**

Lexington conducted no activity whatsoever on the Tribe's land. As far as the record is concerned, Lexington never even entered the Tribe's reservation. Just look at the jumps needed to get from the Tribe to Lexington. First, the Tribe sought insurance from a nonmember insurance broker, who was located off the reservation. *Lexington Ins.*, 94 F.4th at 876. Second, that insurance broker contacted an insurance middleman, "Tribal First," another nonmember company located off the reservation. *Id.* at 877. And finally, that middleman contracted with Lexington, a nonmember located off the reservation. *Id.* The middleman handled all the paperwork. So Lexington is at least three steps removed from any conduct occurring on the reservation. Lexington thus acted 100% off reservation. As the panel had to concede, "all relevant conduct occurred off the [r]eservation" and Lexington was never "physically present" on the reservation. *Id.* at 881.

This concession should end this case. Without any actual physical activity by Lexington on the reservation, no conduct permits jurisdiction. As the Court has emphasized many times, the Tribe's authority "reaches no further than tribal land." *See Atkinson Trading*, 532 U.S. at 653. By detaching on-reservation conduct from actual physical activity on Indian land, we stretch tribal sovereignty beyond the limits set by the Supreme Court. So even though the Tribe's reservation is only 12 square miles, its courts can now reach the furthest corners of the country—and perhaps the ends of the earth.

And it is not enough that the object of the insurance policies was tribal land.  The Court has been clear—transactions with a direct connection to tribal land, without on-reservation conduct, don't suffice for jurisdiction.  So nonmember "conduct taking place on the land" and transactions *related* to the land (like insurance policies on tribal businesses and property) "are two very different things." *Plains Com.*, 554 U.S. at 340.  Without more, Lexington's insuring property and businesses on the land isn't enough to confer tribal court jurisdiction.

*Montana* and its progeny thus hold that tribal jurisdiction over nonmembers requires the nonmember's actual physical presence and activity on the reservation.  Other circuits have recognized this necessity.  *See Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 207 (7th Cir. 2015) ("The actions of nonmembers outside of the reservation do not implicate the Tribe's sovereignty."); *Jackson*, 764 F.3d at 782 & n.42 (ruling against tribal jurisdiction when "[nonmembers] have not engaged in *any* activities inside the reservation[, they] did not enter the reservation to apply for the loans, negotiate the loans, or execute loan documents," and just "applied for loans . . . by accessing a website"); *MacArthur v. San Juan Cnty.*, 497 F.3d 1057, 1071–72 (10th Cir. 2007) ("[A] tribe only attains regulatory authority based on the existence of a consensual employment relationship when the relationship exists between a member of the tribe and a nonmember individual or entity employing the member *within the physical confines of the reservation*.") (emphasis added); *Hornell Brewing v. Rosebud Sioux Tribal Ct.*, 133 F.3d 1087, 1093 (8th Cir. 1998) ("The Internet is analogous to the use of the airwaves for national broadcasts over which the Tribe

can claim no proprietary interest, and it cannot be said to constitute non-Indian use of Indian land.").

**2.**

Contrary to the weight of authority, the panel still found jurisdiction here.  And it did so, first, by misreading Supreme Court precedent and, second, by relying on faulty policy reasons.  I review each error in turn.

First, the panel twists the Supreme Court's clear words mandating "nonmember conduct inside the reservation" into a claim that courts have "never stated that physical presence is necessary to conclude that nonmember conduct occurred on tribal land."  *Lexington Ins.*, 94 F.4th at 882.  So it expressly disclaimed any "require[ment that] the nonmember . . . be physically present on those lands."  *Id.*  To justify these linguistic gymnastics, the panel almost entirely relies on six words from *Merrion*.  Recall that case involved a tax on natural resources removed from tribal land by nonmembers.  *Merrion*, 455 U.S. at 135–36.  While explaining the origin of tribal taxing authority, the Court observed: "a tribe has no authority over a nonmember until the nonmember enters tribal lands *or conducts business with the tribe*."  *Id.* at 142 (emphasis added).  The panel took these words to confer vast authority over nonmembers for off-reservation actions.  According to the panel, "[n]owhere . . . has the Court limited the definition of nonmember conduct on tribal land to physical entry or presence."  *Lexington Ins.*, 94 F.4th at 881.  Taking the six words from *Merrion* as license to disregard clear precedent, the panel concluded that the "Court has explicitly recognized that a nonmember *either* entering tribal lands or conducting business with a tribe can make that person subject to a tribe's regulatory authority."  *Id.*

But the panel failed to appreciate the context of the *Merrion* statement before overreading it.  To begin, in that section of the opinion, the majority was responding to the dissent's argument "that a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands, and that this power provides a basis for tribal authority to tax." *Merrion*, 455 U.S. at 141.  The majority sought to refute the dissent's claim that the taxing power must derive from the power to exclude.  It thus wrote:

> Instead, these cases demonstrate that a tribe has the power to tax nonmembers only to the extent the *nonmember enjoys the privilege of trade or other activity on the reservation* to which the tribe can attach a tax. This limitation on tribal taxing authority exists not because the tribe has the power to exclude nonmembers, but because *the limited authority that a tribe may exercise over nonmembers does not arise until the nonmember enters the tribal jurisdiction*. We do not question that there is a significant territorial component to tribal power: a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe. However, we do not believe that this territorial component to Indian taxing power, which is discussed in these early cases, means that the tribal authority to tax derives solely from the tribe's

> power to exclude nonmembers from tribal
> lands.

*Id.* at 141–42 (emphasis added). Put into context, the "conducts business with the tribe" fragment is directly connected to nonmember activity *inside* the territorial bounds of the reservation. Every other part of that paragraph refers to "activity on the reservation," "nonmember ent[ry into] the tribal jurisdiction," and the "territorial component to tribal power." *Id*. As the "Court has long stressed . . . the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (simplified). Yet that is exactly what the panel did.

If that's not convincing enough, the Supreme Court itself tempered an expansive reading of *Merrion*'s language. In *Atkinson Trading*, the tribe argued for a broad authority over nonmembers and cited *Merrion* as expanding the reach of the tribe's authority beyond the limits in the *Montana* line of cases. 532 U.S. at 652–53. Rejecting this view, the Court wrote, "*Merrion*, however, was careful to note that an Indian tribe's inherent power to tax only extended to '*transactions occurring on trust lands* and significantly involving a tribe or its members.'" *Id.* at 653 (quoting *Merrion*, 455 U.S. at 137) (emphasis added). The Court wrote that "[t]here are undoubtedly parts of the *Merrion* opinion that suggest a broader scope for tribal taxing authority than the quoted language." *Id.* But it rejected that broad reading, emphasizing "*Merrion* involved a tax that only applied to activity *occurring on the reservation*, and its holding is therefore easily reconcilable with the *Montana–Strate* line of authority, which we deem to be controlling." *Id.* (emphasis added). And the Court closed by reiterating the

core proposition of the *Montana* cases: "[a]n Indian tribe's sovereign power . . . reaches no further than tribal land." *Id.*

Finally, since it corrected its loose language, the Court has never again quoted the "conducts business with the tribe" phrase. Other circuits have gotten the hint; we are the only one to have ever quoted that language in any context. Even then, since *Atkinson*, we have done so only once and in passing. *See Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1139–40 (9th Cir. 2006) (en banc). And *Smith* involved conduct which physically "occurr[ed] on the reservation" and had nothing to do with a business relationship. *See id.* at 1135. All told, *Merrion*'s six words cannot support the panel's theory—upending the entire framework of tribal jurisdiction with a phrase tempered by its surrounding language, disclaimed by the Court, and never relied upon by any other circuit. At the very least, it is not a "foundational rule" as the panel framed it. *Lexington Ins.*, 94 F.4th at 881.

And the panel's policy arguments do not move the needle either. The panel first appeals to technological innovations, claiming that jettisoning physical presence "makes sense in our contemporary world in which nonmembers, through the phone or internet, regularly conduct business on a reservation and significantly affect a tribe and its members without ever physically stepping foot on tribal land." *Id.* But mail, telephone calls, and the internet existed long before the panel's decision in February 2024. And yet the Court did not see it fit to alter its framework for those modes of communication. Indeed, contrary decisions from other circuits sometimes involved the internet. *See, e.g.*, *Jackson*, 764 F.3d at 782 (rejecting tribal jurisdiction where nonmembers "applied for loans in Illinois by accessing a website [hosted by the tribal entity]"); *Hornell Brewing*, 133 F.3d at 1093 (rejecting tribal jurisdiction where nonmember

offered advertising on the internet available to tribal members).

So too for the panel's concern that tribes will be left unprotected without tribal jurisdiction. When courts deny tribal jurisdiction, they do what *Montana* and its progeny require—apply generally applicable state law. *See, e.g.*, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) ("Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."); *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1312–13 (D.C. Cir. 2007) ("[W]hen a tribal government goes beyond matters of internal self-governance and enters into off-reservation business transactions with non-Indians, its claim of sovereignty is at its weakest . . . [when] engaging in privately negotiated contractual affairs with non-Indians, []the tribal government does so subject to generally applicable laws."). Our court has observed the same. *Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 715 (9th Cir. 1980) ("We see no reason why commercial agreements between tribes and private citizens cannot be adequately protected by well-developed state contract laws."). So the Tribe will be adequately protected by Washington law or the other state law chosen by the parties.

Finally, perhaps recognizing the sweep of its decision, the panel sought to minimize it by claiming that "sophisticated commercial actors, such as insurers" could avoid the opinion's scope by "insert[ing] forum-selection clauses into their agreements with tribes and tribal members." *Lexington Ins.*, 94 F.4th at 887. But that doesn't recognize that tribal courts will have the first crack at deciding whether to give these clauses effect—potentially

leaving nonmembers in much the same position as before. And ultimately "[t]he ability of nonmembers to know where tribal jurisdiction begins and ends, it should be stressed, is a matter of real, practical consequence given the special nature of Indian tribunals." *Hicks*, 533 U.S. at 383 (Souter, J., concurring) (simplified).

In turn, the panel ignored the harm that this decision will bring to Indian tribes within our circuit. Given the huge uncertainty and great expense associated with being haled into tribal courts and subject to uncertain tribal law, many nonmembers may abandon business with tribes and tribe members. After all, why should they subject their businesses and employees to this newly minted vulnerability just by answering a phone call, sending an email, or using an internet insurance portal? If nonmembers cut back on tribal commerce, fewer goods and services will be available for purchase by tribe members. And those products that remain will suffer from reduced competition. In the case of insurance, premiums must now price in unpredictable tribal law. The inescapable consequence of the panel's opinion is higher prices for tribes, which are already among the most deprived socioeconomic groups.

* * *

The key question here was an easy one: whether the "nonmember conduct inside the reservation" requirement means what it says. *Plains Com.*, 554 U.S. at 332 (emphasis removed). The panel discarded that requirement—so any commercial action anywhere in the world can be constructively made into on-reservation conduct so long as the off-reservation "business conduct[ed] with the [t]ribe . . . is directly connected to tribal lands." *Lexington Ins.*, 94 F.4th at 881. This constructive presence rule is out of sync

with the long history of tribal jurisdiction and current doctrine.  We should have corrected the error en banc.

## B.

## *Plains Commerce*'s Inherent Sovereign Authority Requirement Not Met

The panel also erred on a second important issue.  It refused to determine whether the *type* of tribal regulation here falls within the limited sovereign powers that tribes may maintain over nonmembers.  The "tribe's inherent power does not reach beyond what is necessary to protect tribal self-government or to control internal relations." *Strate*, 520 U.S. at 459 (simplified).  Thus, "tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them." *Hicks*, 533 U.S. at 361; *see id.* at 364 (applying that rule to forbid tribal regulation because doing so "is not essential to tribal self-government or internal relations—to the right to make laws and be ruled by them" (simplified)).

In *Plains Commerce*, the Court clarified the effect of this limitation.  Even when *Montana*'s consensual relationship exception is otherwise satisfied, federal courts must still assure themselves that tribal jurisdiction "stem[s] from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Plains Com.*, 554 U.S. at 337 (citing *Montana*, 450 U.S. at 564).  Only when the subject matter at issue "intrude[s] on the internal relations of the tribe or threaten[s] tribal self-rule" do we accede to tribal jurisdiction.  *Id.* at 334–35. So we must *also* look to whether the type of tribal regulation derives from a permissible font of sovereign authority.

Thus, even when a *Montana* exception applies, three circuits have read *Plains Commerce* to require separate judicial inquiry into whether the relevant regulation is necessary to the tribe's inherent sovereign authority before approving an assertion of regulatory or adjudicative authority.

- The Seventh Circuit denied tribal jurisdiction because, aside from lacking nonmember on-reservation conduct, "[the tribal entities] made no showing that the present dispute implicate[d] *any* aspect of 'the tribe's inherent sovereign authority.'" *Jackson*, 764 F.3d at 783.

- The Eighth Circuit explained that "[e]ven where there is a consensual relationship with the tribe or its members, the tribe may regulate non-member activities only where the regulation 'stem[s] from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations.'" *Kodiak Oil & Gas (USA)*, 932 F.3d at 1129 (quoting *Plains Com.*, 554 U.S. at 336).

- In dicta, the Sixth Circuit has observed: "At the periphery [of tribal authority], the power to regulate the activities of non-members is constrained, extending only so far as 'necessary to protect tribal self-government or to control internal relations.'" *Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d at 546 (quoting *Montana*, 450 U.S. at 564). And when courts review the authority of a tribe, "[t]ribal regulations of non-member activities must 'flow directly from these limited sovereign interests.'" *Id.* (quoting *Plains Com.*, 554 U.S. at 335).

Only the Fifth Circuit has held otherwise. *See Dolgencorp*, 746 F.3d at 175 ("We do not interpret *Plains Commerce* to require an additional showing that one specific relationship, in itself, 'intrude[s] on the internal relations of the tribe or threaten[s] self-rule.'") (simplified). Even so, five judges dissented from denial of rehearing en banc. *See Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 588, 590 (5th Cir. 2014) (Smith, J., dissenting from denial of rehearing en banc).

Our court's panel rejected the majority view, concluding, "[i]f the conduct at issue satisfies one of the *Montana* exceptions, it necessarily follows that the conduct implicates the tribe's authority in one of the areas described in *Plains Commerce*." *Lexington Ins.*, 94 F.4th at 886. That's simply wrong. Just look at this case. Whether Lexington entered a consensual relationship with the Tribe tells us nothing about whether the Tribe's authority stems from its sovereign interests. A relevant consensual relationship under *Montana* may show the nonmember's consent to tribal regulation and perhaps notice of tribal authority, but it doesn't tell us whether jurisdiction flows from the tribe's inherent sovereign authority. So "whatever 'consensual relationship' may have been established through" Lexington's "dealing with" the Tribe, the Tribe must still prove its authority derives from its need to "set conditions on entry, preserve tribal self-government, or control internal relations." *Plains Com.*, 554 U.S. at 337–38.

And, on that front, it's doubtful that the Tribe can justify its authority over this insurance suit. The regulation of insurance contracts has nothing to do with the Tribe's right to exclude (as Lexington has not entered, and doesn't seek to enter, the reservation). And neither does the Tribe's interest in tribal self-governance and control of internal

relations support a tribal regulatory scheme for insurance. Even though the Tribe has the "right to make [its] own laws and be governed by them," that doesn't mean it may "exclude all state regulatory authority on the reservation." *Hicks*, 533 U.S. at 361. When tribal authority implicates "state interests outside the reservation, . . . [s]tates may regulate the activities even of tribe members on tribal land." *Id.* at 362. And here, insurance law has long been the province of state regulation. "States enjoyed a virtually exclusive domain over the insurance industry." *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 539 (1978). In contrast, there's no history of tribal regulation in this area of law. Indeed, no Tribe insurance code exists. It's no wonder why the policies here were registered "under the insurance code of the state of Washington." All this suggests no role for tribal regulation under *Plains Commerce*.

## IV.

The Ninth Circuit, once again, is an outlier on the law. This time we put ourselves at odds with every other circuit on the question of tribal jurisdiction over nonmembers. Now we pierce the geographic limits of tribal jurisdiction and refuse to consider the substantive limits on what tribes may regulate. Our decision provides near limitless tribal jurisdiction over nonmembers worldwide so long as they hold themselves out for business with tribes. This case cried out for rehearing en banc. It is a shame that we have chosen otherwise.